OF

# THE SUPREME COURT

OF THE

## STATE OF ILLINOIS,

### JANUARY TERM, 1860, AT SPRINGFIELD.

---

Levi Palmer, Plaintiff in Error, *v.* John M. Forbes *et al.*, Defendants in Error.

#### ERROR TO ADAMS.

The fuel, oil, and property of that description, belonging to a railroad company and intended for daily consumption, is personal property;

While the rolling stock and material for repairs of the track, designed to be attached to the realty, is real estate.

In this case, a deed of possession of the road and other property of the company was given to the trustees, who, without taking possession personally, hired the former superintendent and the other employees of the road, to carry on the business as their agents and servants, and put up notices all along the road, of the change of management. *Held,* that such change of possession was sufficient.

When a mortgage or deed of trust gives to the trustees therein named the power to use and run a railroad, as the agents and attornies of the company mortgaging it, that fact does not affect or give character to the title or possession of the property, but only to the mode and manner of using it; and a proper transfer under the power, will cut off all liens not acquired prior to that transfer.

The first object of the legislature in granting authority to construct a railroad, is the benefit to the public arising from the use of the road. Hence the power to mortgage will not be construed to authorize the mortgagee to take up and sell the material of which the road is made, so as to interfere with its beneficial use by the public.

The authority to mortgage a railroad, etc., implies the authority to sell the thing mortgaged, and to convey to the purchaser all needful powers to use the thing purchased, in a proper and beneficial manner.

The personal property of a railroad, in the possession of a mortgagee, is no longer subject to be taken in execution for the general debts of the road.

Palmer *v.* Forbes et al.

THIS was an action of replevin by defendants in error against plaintiffs in error.

The declaration contains two counts; the first for *taking*, and the second for detaining.

To the first count the defendant pleaded: 1st. Traversing property in plaintiffs. 2nd. The levy upon the property as deputy marshal under the execution read in evidence, and averring that the property was subject to execution. 3rd. Property in Quincy and Chicago Railroad Company. 4th. Property in defendant.

To the second count the defendant pleaded: 1st. Traversing the plaintiff's right to possession; and other pleas substantially the same as the second, third and fourth pleas to the first count.

Upon these pleas, issue to the country was taken, and a verdict was found for the plaintiffs below.

It was admitted that defendant had possession of the property and refused to deliver to plaintiffs before the date of the writ.

The plaintiffs offered to read in evidence a deed from the Northern Cross Railroad Company, by Nehemiah Bushnell, president, and Charles A. Savage, treasurer of said company, unto John M. Forbes, John Eliot Thayer and Louis Ferdinand Von Hoffman, dated July 1, 1853.

This deed recites the issuing of bonds by the company, payable to the holders thereof, to the amount of $1,200,000, and conveys to the grantees all the present and future to be acquired property of the company, " including all the iron rails and other materials purchased or to be purchased or paid for with the above described bonds, or the money obtained therefor."

To hold the same *in trust;* that is, if the company fail to pay any moneys due on said bonds or any interest after due " when demanded, then after sixty days from such default, upon the request of the holder of any bond," the trustees may take possession of the premises, and as the attorneys in fact or agents of the company, have, use and employ the same, making needful repairs, alterations and additions thereto, and after deducting expenses of such use, repairs, alterations and additions, apply the proceeds thereof to principal and interest of all bonds remaining unpaid.

Provides for making any further deeds, etc. deemed necessary.

Provides for application of moneys, proceeds of bonds, to building and equipping railroad.

Provides that trustees shall only be accountable for reasonable diligence in the management of the road, and shall not be responsible for acts of any *agent employed by them* when such agent shall be employed with reasonable discretion; that trus-

tees shall be entitled to compensation ; that trustees shall not be responsible for acts of each other.

This deed was executed by the trustees and acknowledged by each party, as in case of deed for land.    Acknowledged also by Bushnell, as president, as in case of chattel mortgages, June 21, 1855, and recorded in Adams county same day.

The plaintiffs read in evidence a deed executed by said company, by said Bushnell, as president, and said Savage as treasurer, to the same parties, dated November 29, 1854.

This deed recites the making of the deed of July 1, 1853 ; that since the making thereof the moneys received from the bonds in said deed mentioned, have been applied to the construction of the road, etc., and the purchase of three locomotives, etc., and conveys to the trustees all the property of the company comprehended in the description of the deed of July 1, 1853, and acquired subsequent to said deed ; to hold *in trust*, for the purposes and in the manner in said first deed mentioned, for the benefit and security of the holders of the bonds therein mentioned.    Acknowledged as in case of deeds for land, and recorded in Adams county, Nov. 29, 1854.

The plaintiffs also read in evidence a deed executed by said company, by said Bushnell as president, and said Savage as treasurer, unto said Forbes, Thayer and Louis A. Von Hoffman, dated December 1, 1854.

This deed recites the deed of July 1, 1853, and the issuing of second bonds to the amount of $1,000,000, and conveys the company's property to the grantees in the same manner as is done by the deed of July 1, 1853, and contains substantially the same provisions for taking possession by trustees upon default, on demand, of money due, request of holder of bond and lapse of sixty days after demand, and same general provisions.    Acknowledged as in case of deeds for land, and as in case of chattel mortgages, and recorded July 3, 1855.

The plaintiffs also read in evidence a deed of said company, by said Bushnell, as president, and John C. Cox, treasurer, unto said Forbes, Thayer and Louis A. Von Hoffman, dated October 31, 1856.

This deed recites the deed of December 1, 1854 ; that the moneys arising from bonds in said deed mentioned have been applied to building and equipping the road, and the purchase of ten locomotives, etc.; conveys all property of company comprehended in the description in said deed of December 1, 1854, and acquired subsequently thereto, *in trust*, for the benefit of bond holders, and to secure said bonds, and upon the trusts, in the manner and for the purposes in said deed of December 1, 1854, described.

Acknowledged as in case of deeds of lands, and also as chattel mortgage, and recorded in Adams county, November 8, 1856.

To each of these said deeds, when offered, the defendant objected, and specially for want of proof of execution; but the court admitted each of them, without proof of execution, and defendant excepted.

None of said deeds provide for possession remaining with the mortgagors.

The plaintiffs then read in evidence a deed of said company, (the name being changed to the Quincy and Chicago Railroad Company,) by said Bushnell as president, to said Forbes, Thayer and Louis A. Von Hoffman, the trustees in the mortgage of December 1, 1854, and executed by them, dated May 27, 1857.

This deed recites the deed of July 1, 1853, and the deed of December 1, 1854, and that the company had made default in said two recited mortgage deeds in this ; that on the first there was due and unpaid for interest which became due January 1, 1857, on the bonds mentioned in said mortgage, coupons to the amount of $8,000, and that on the second there remained due and unpaid coupons for the whole interest, which became due January 1, 1857, on the bonds mentioned in said second mortgage, and that the company were unable to pay the interest which would become due on the bonds mentioned in said mortgages, July 1, 1857,—recites that the trustees had demanded possession of the property, and that said Von Hoffman was present to receive possession. The deed transfers to said mortgagees the whole property of the company, and empowers them to take possession thereof, and of all the rights and franchises of the company.

To have and to hold the same for the uses and purposes contemplated by the two recited mortgages. The trustees covenant, that they will, as the attorneys in fact, or agents of the company, and in the name of the company, continue to use the road and property in the carrying business, according to the intention of the construction of the road; and will apply the increase,

1st. To pay the expenses of the trust, and of keeping the road in operation and repair.

2nd. To pay taxes and to discharge the local and operative indebtedness of the road of about $40,000, stated in a schedule then delivered to trustees (which schedule is in evidence.)

3rd. To such alterations and additions to the road as the trustees may deem expedient.

4th. To pay interest on the bonds under mortgage of July 1st, 1853.

5th. To pay interest on the bonds under mortgage of December 1st, 1854.

Recites that company, on 1st November, 1856, made a mortgage to John Eliot Thayer and Louis A. Von Hoffman on same property, to secure certain bonds therein mentioned, and the trustees covenant, that upon default in payment of interest on the bonds secured by said recited mortgage, upon request of the mortgagees in said mortgage, they will deliver over to them possession of the property to be controlled by them upon the same terms, conditions, and in the same manner, as is required of the trustees to whom the property was then transferred; and upon the further condition that they apply the income of the road,

6th.   After paying interest on the bonds secured by mortgages of July 1, 1853, and October 31, 1854, to the payment of interest on the bonds secured by said recited mortgage of November 1, 1856.

And provides, that in case of all interest being paid, due upon bonds secured by the mortgages, so that no default exists in that respect, the whole property shall be re-delivered to the company, to be held subject to said mortgages, etc., and that nothing therein contained shall hinder or suspend the right of any one to have any of said mortgages foreclosed.

This deed is acknowledged as in case of deeds of land, and also as a chattel mortgage, and was recorded in Adams county, June 6, 1857.

The defendant objected to the reading of this deed, and especially objected for want of proof of execution, but the court overruled the objection, and the defendant excepted.

The defendant admitted the due incorporation and organization of the company.

It was admitted that so much of the property in controversy as was on hand on the 27th May, 1857, was then the property of the Quincy and Chicago Railroad Company.

The plaintiffs then read in evidence, from the records of proceedings of the Board of Directors of said railroad company, resolutions of said board, authorizing the execution by the officers by whom the same were respectively executed, of said deeds of July 1, 1853, November 29, 1854, December 1, 1854, October 31, 1856, and the deed and schedule of May 27, 1857, before read in evidence, so far as said Board of Directors had power to authorize the execution of the same.

The plaintiffs then offered in evidence a power of attorney executed by Forbes, Thayer and L. A. Von Hoffman to N. Bushnell, dated June 2, 1857, as the authority under which said Bushnell had acted for plaintiffs in respect to the property sued for, and proposed to follow it up with proper proof to connect it with the plaintiff's claim to the said property.   To the reading of which in evidence, the defendant (though admitting its

20

execution) objected at the time, but the court overruled the objection and permitted the plaintiffs to read said power of attorney to the jury ; to which opinion and decision of the court overruling his said objection, and permitting said power of attorney to be read in evidence, the said defendant, by his counsel, excepted.

Said power of attorney is in the words and figures following, to wit :

*Whereas*, the Quincy and Chicago Railroad Company, (late the Northern Cross Railroad Company,) a corporation created and existing under and by virtue of the laws of the State of Illinois, by reason of their default in the non-payment of the interest which became due on the 1st day of January last, on the first and second mortgage bonds, and their inability to provide for the interest to become due and payable on said bonds, on the first day of July next, have, at the request of the undersigned, trustees named in the said second mortgage, and in pursuance of the provisions therein contained, transferred and delivered unto the said trustees, as per their deed bearing date the 29th day of May, A. D. 1857, the possession of the said Quincy and Chicago Railroad, which runs from the city of Quincy, on the Mississippi River, to the town of Galesburg, Knox county, Illinois, including the right of way and land occupied thereby, together with the superstructure and tracks thereon, and all the rails and other materials used thereon, or provided therefor, bridges, viaducts, culverts, fences, depot grounds, and the buildings thereon, engines, tenders, cars, tools, materials, machinery, and all other property, real and personal, pertaining to said road or the running and using thereof, together with the tolls, rents or income, to be had, levied, or derived therefrom, and all franchises, rights and privileges of the said railroad company, of, in, to, or concerning the same, to have and to hold, and use the same for the uses and purposes in the said deed mentioned.

*Now, therefore,* Know all men by these presents, that we, John M. Forbes and John Eliot Thayer, of the city of Boston, and Louis A. Von Hoffman, of the city of New York, the trustees named in the said second mortgage, in and by virtue of the power in and by the said mortgage and deed conferred upon us, do hereby nominate, constitute and appoint Nehemiah Bushnell, of the city of Quincy, in the State of Illinois, our true and lawful attorney in fact, and agent, and do also hereby substitute and depute said Nehemiah Bushnell to be the lawful agent and sufficient attorney of the said railroad company, with all and every power and authority in our and in each of our names and stead, as our lawful agent and attorney in fact, and substitute, and in the name and stead of the said railroad company, of act-

ing in the same stead, and in the same manner, and with the same extent of power, discretion and authority, and for the same uses and purposes granted to us in and by the said deed of the 27th day of May, A. D. 1857, and which we can lawfully exercise and delegate; and with full power and authority as our general agent, attorney in fact, and substitute, to enter upon and have the charge, supervision and management of all the property and business of said road committed to our possession and management in and by the said deed, and the receipt, collection and disbursement of the rents, tolls, revenue and income to be had, levied or derived therefrom, in the execution of the duties and trusts provided in said deed, and for that purpose to employ such officers, clerks, agents and others, as he may deem needful and proper to, in the transaction and carrying on of the business of said road, and the accomplishment of the objects intended to be provided by the said deed, and specified therein; and for that purpose, our said agent, attorney in fact, and substitute, is hereby authorized and empowered in our names, and in the names of each of us, and in the name and as the agent and attorney of said railroad company, as may be lawful, to execute and deliver any and all contracts, agreements, bonds and other instruments in writing, with or without seal, which may in his discretion be needful or proper in the execution of the powers, duties and business hereby confided and delegated to him.   Our said agent, attorney in fact, and substitute, to be accountable only for reasonable diligence in the management of the affairs hereby committed to him, and not to be responsible for the acts of any officer, agent, clerk, or other person employed by him, when such officer, agent, clerk or other person shall be employed with reasonable discretion; hereby ratifying and confirming whatever our said attorney may lawfully do by virtue hereof, and restricting the powers hereby granted, to such acts as we are legally authorized to perform by virtue of the said deed.

In witness whereof, etc.

*Nehemiah Bushnell,* a witness for the plaintiffs, testified as follows:

The two mortgages given in evidence were executed to secure a *bona fide* indebtedness of the company, for the purposes and amounts as stated in the mortgages, which are therein truly stated.   The bonds therein mentioned were sold to raise means to build the road, and the money derived from the sale was all applied to it, and the road could not have been built without them.   The company had, besides, as means to build the road, a subscription of the city of Quincy of $200,000, and the county of McDonough, $75,000, payable in bonds of said city and county, and other local subscriptions of individuals.

The deed of May 27, 1857, was executed by me on the part of the company, at this place, on the day of its date, and was done in good faith, and under the necessities imposed on the company, and under the belief of myself and the directors of the company, that by so doing, a foreclosure and sale by the trustees of the road and all its property, would be avoided, and by this means we might have a chance to work out of the difficulty, and ultimately be able to pay off the floating debt of the company, and perhaps secure to the stockholders a portion of their stock. The deed was executed by the trustees at Boston, on the 2nd June, 1857, to which place I went from here in company with Mr. Von Hoffman—afterwards, on that day, and at that place, the said Forbes, Thayer & Von Hoffman executed and delivered to me the power of attorney which has been read in evidence. At the time of the execution by the said trustees of the said deed, the Quincy and Chicago Railroad, and all its property and business, were delivered over to the said Forbes, Thayer and Von Hoffman, under and in pursuance of the said deed.

The time the trustees actually got possession and control of the road, under the said deed, was the 10th June, 1857. From Boston I gave written notice to the chief officers of the road, and those along the line of the road, informing them of the change that had taken place in the possession and control of the road. I also wrote to Col. Hammond, informing him of the change and of my appointment as agent, and confirming the running arrangement which had previously existed between this road and the Chicago and Burlington Railroad Company, and was operated under the same supervision, with Col. Hammond as superintendent of both roads. I appointed Mr. Cox as receiver of the trustees. As agent of the said trustees, under the said power of attorney, given in evidence, I took possession of the said Quincy and Chicago Railroad, and all its property, and have continued in possession of the same from that time, say June 10th, 1857, ever since, as agent of the trustees and plaintiffs, and survivors of them, and to use and control and operate said road and property, as their agent and not otherwise, and in operating said road, and in the use of said property, I have acted as the agent of the said trustees, and in no other capacity. I found afterwards, on my return to Quincy, which was about the 12th or 15th of June, 1857, that these notices had been posted up in the offices along the line of the road as I had directed. I then took the control and management of the road and its property and business, as the attorney of the trustees, under the power of attorney as before stated, and have ever since continued to control and manage said business and property in that

capacity, and in no other.   There was no other manual or formal delivery over of the possession of the road and its property to the said trustees, than by notice to officers and employees of the road, and the subsequent control and management of the road, its property and business, for the trustees, in manner already stated.

The property of the road consisted of engines, tenders, passenger, freight and baggage cars, wood along the line of the road, tools, machinery, etc., etc.   The property was all for use along the road, and necessary for the use of the road.   Of the property in this case [here the execution was shown witness] all the locomotives with their tenders, the twenty-five tons of miscellaneous iron, and the twenty locomotive tires, all belonged to and were in the possession of the railroad company, on its road, at the time the deed of 27th May, 1857, was executed, and are a part of the property which was transferred and delivered to the trustees under that deed, and have been in my possession and control as their attorney, in conducting the business of the road, ever since.   In respect to the twenty-one railroad car axles, the sixty-three new railroad car wheels, and the fifty new railroad car wheels with axles fitted to the same, together with axles : I cannot say whether these particular wheels and axles were on hand when the deed of the 27th May, 1857, was executed, and delivered over under that deed or not.   If any of these particular wheels were on hand then, they were transferred and delivered to the said trustees under that deed.   Any of said car wheels and axles which were not then on hand, have been since purchased by the trustees for the necessary use of the road, and belong to them, and have at no time belonged to or been in possession of the company.

The ten casks of oil in controversy were purchased by the said trustees for the necessary use of the road but a few days before they were levied on by the defendant, under the execution shown me, and were never in the possession or belonged to the railroad company.   The one hundred and fifty-four tons of railroad iron in controversy were purchased by Messrs. J. E. Thayer and Bro., for the use of the road, to repair the track.   This was in the fall of 1857, the iron then being in New Orleans.   It was forwarded from New Orleans to Quincy under my directions, where it arrived in May, 1858.   I paid the freight from New Orleans, $8.50 per ton, and about $50 expenses on it at New Orleans, on its arrival in May, and on the 20th July last, paid the government duties, which were $1,428.24.   These payments were made out of the earnings of the road.   J. E. Thayer and Brother paid for the iron, exclusive of the freight, duties and charges, amounting to $8,000, which I was to repay them out of the earnings of the

road, and they permitted the iron to come forward to Quincy so that we could have it to use as soon as it was paid for, on my personal pledge of honor that it should not be used till it was paid for. Though this iron was much needed for repair of the track, I could and did make no payment on it to J. E. Thayer & Brother, till a few days before this trial, when I sent them $3,000, which is all they have been paid ; this was paid out of the earnings of the road. The iron was purchased for the trustees through me, as their attorney, who have been in possession of it, as such attorney, till it was levied on by the defendant. It has at no time belonged to or been in the possession of the company. The property levied upon by the defendant, under the execution shown me, which was on hand on the 27th May, 1857, was included in the mortgages given in evidence, and was transferred and delivered to the trustees in pursuance of the deed of that date. All the property so levied on, which was not on hand on 27th May, 1857, has since been purchased by the trustees, and so far as paid for, has been paid for out of the earnings of the road. The power of attorney in evidence was executed by Forbes, Thayer & Von Hoffman in my presence. This is the authority under which I have been operating the road, and the only authority under which I have conducted the current business of the road, and controlled the property of the trustees. Since that time, the company have had nothing to do with running the road or controling the property belonging to the same.

My whole business in relation to the operative business of the road since May 27th, 1857, has been as agent for the trustees.

The duties on the iron were paid with money borrowed upon my personal note, and was afterwards repaid to me from the earnings of the road.

The trustees in person never had possession of the road and its property, only through me as their agent.

Col. Hammond was superintendent of the running arrangements with the Chicago and Burlington Railroad Company.

Col. Hammond continued to act as superintendent in the same way after 27th May, 1857, as before—he was re-appointed by me as agent. In the substantial manner of doing business there has been no change.

This cause was tried before SIBLEY, Judge.

J. GRIMSHAW, and A. WHEAT, for Plaintiff in Error.

BROWNING & BUSHNELL, for Defendants in Error.

CATON, C. J.   Railroad mortgages, like all other contracts,

must be enforced according to the intention of the parties to them, and conformable to the law under which they were issued. We cannot make or mollify these any more than any other contracts, or the law by which they shall be governed and enforced. Railroad mortgages are of very recent origin, and, although now so common in this country and in England, in comparatively but few instances, have the courts been called upon to enforce the rights of parties under them, especially to the extent of appropriating the estate mortgaged to the satisfaction of the debt. And the courts first leading the way in this branch of jurisprudence cannot but be deeply impressed with the weight of the responsibility thrown upon them, and it would be remarkable indeed should there not, at the outset, be some diversity of opinion on the subject. We think we see in the future that, which is likely to throw upon us our full share of the earliest of this responsibility, and we cannot approach the subject but with the deepest solicitude.

Railroad companies can only issue these mortgages in pursuance of a power conferred upon them by their charters, or some general statute. Hence it is of primary importance in the first instance, to see what the law is under which a mortgage is executed. The charter of this road authorized it to issue bonds and " secure the payment of the same by mortgage, or deed of trust, on the whole or any part of the road property and income of the company, then existing or thereafter to be acquired." Nowhere do we find any provision made as to the mode of acknowledging or recording these mortgages, or of the effect they shall have upon the rights of subsequent purchasers or creditors. This seems to have been left, by the legislature, to be influenced and controled by the general law of the State on the subject. The road and property of the company may include its personal property, as well as the real estate, consisting of the road and its appurtenances. As there is no specification as to how the personal property shall be mortgaged, the general law regulating chattel mortgages, is left to regulate the mode of executing that power. There is as much propriety in defending and protecting the rights of third persons, who deal with railroad companies, as there is of those who deal with individuals, who possess the same natural rights and powers which have, by law, been imparted to these corporations, and there is nothing in our legislation indicating an intention to make any distinction, except in a few special cases, where charters have made special exceptions, as in the case of the St. Louis, Alton and Chicago Railroad Company, where the fourth section of the charter of which provides that the mortgages upon personal property of the company shall be valid liens thereon, although

not acknowledged as required by our chattel mortgage law. How far this would dispense with conformity to other provisions of that statute, it is not necessary now to inquire. Where the charter, or a general law of the State, authorizes a railroad company to mortgage either its real or personal estate, and provides no mode of execution or recording, and specifies no form for the instrument, and declares no effect which it shall have upon the rights of the parties or others, it would seem to follow, necessarily, that such mortgages must be subject to and governed by the general laws of the State, regulating mortgages ; at least, so far as the general laws are applicable to the subject matter of the mortgage. As our laws applicable to mortgages of real and personal estate differ, the necessity of determining what is personal and what real estate is imposed upon us.

That the railroad itself, including the ground and superstructure, as well as the depot grounds, buildings and turntables, and the like, are real estate, no doubt has ever been expressed, but it is denied that the rolling stock and other property, capable of being removed from the road without breaking the soil or leaving a trace of the removal, is to be treated as a part of the road itself, and pertaining to the real estate.

We are of opinion that the rolling stock, rails, ties, chairs, spikes, and all other material brought upon the ground of the company incumbered by the mortgage, and designed to be attached to the realty, should be considered as a part of the realty, and incumbered by the mortgage as such ; but fuel, oil, and the like, which are designed for consumption in the use, and which may be sold and carried away, and used as well for other purposes as in the operation of the road, and when taken away have no distinguishing marks to show that they were designed for railroad uses, cannot, we think, with any propriety, be treated or considered as anything but personal property, and subject to, and governed by the law applicable to such property. Indeed, it is hardly to be supposed, that it was the understanding of the parties, that personal property, designed for immediate consumption, was ever intended to be embraced in the mortgage, except such as might be on hand at the time the mortgagees or trustees should foreclose or take possession under the mortgage. So long as the mortgagors should retain possession of and operate the road, all knew and intended that such property could never in any event be sold, or in any way appropriated to the satisfaction of the debt, by the trustees. All knew, that the process of consumption and fresh supplies of such property must be ever going on, and that it could never be touched by the trustees, except what might happen to be on hand at the moment possession should be taken. To say that a mort-

gage, which upon its face provides for its maturity twenty years hence, was designed to embrace and hold the fuel and oil which all knew and intended should be consumed to-morrow, if not absurd, is a refinement beyond that practical common sense which we are capable of comprehending. As a practical truth, we cannot for a moment believe that such was the honest purpose or intention of either party. Indeed, such an intention could have been entertained by either party, only for the purpose of protecting the property from the creditors of the company for its benefit, that it might consume and use it, and not that it might be appropriated by the law or by the trustees in the payment of the bonds. But property designed for permanent use, and which was expected would continue permanently in the use of the road, or if worn out gradually, would be as gradually replaced, so that practically the same thing continued, it was the undoubted design of both parties should be embraced in the mortgage, and ultimately appropriated to the payment of the debt.

We are not departing from the common law rule, when we hold that the rolling stock and material provided for the repair of the track, are a part of the real estate. It is not necessary in all cases that things should be actually affixed to the freehold, in order to constitute a part of it for the purpose of transfer and sale. Take the case of mill stones, which are constantly being taken up and sharpened; when up, they are as much a part of the mill as when in their beds, and would pass by a deed or mortgage of the mill, if they had been, in fact, detached for six months. So of various kinds of machinery, as a screw or cutting engine, or lathe, where a great multitude of different sized pinions or cutters are kept on hand, but only one of which can be used at a time. All of these are necessary to make the complete machine, and would pass by a sale of the factory as being a part of it, but with no more propriety than is the rolling stock a part of the railroad. No road can be complete without its machinery, any more than would a cotton or a grist mill. Would not the sale of a foundry, as such, convey the flasks and moulds within it? Yet who would contend that the coal on hand would pass by such a description, or that a mortgage of a foundry and the stock on hand, would protect the coal which the mortgagor was actually putting into the furnace, from an execution against him, or prevent him from selling it to his neighbor, and conveying a good title? Money is property, and by the terms of the mortgage, was embraced within it, but we cannot presume that it was the intention of the parties that the money on hand, and which both parties expected and intended should be immediately paid out and expended in the operation of the

road by the mortgagor, was subject to the lien of the mortgage, and that no person knowing of the existence of the mortgage, could receive it of the company, without making himself liable to the mortgagees. We venture to say that no one expected or intended that any such right was secured to the mortgagee by the mortgage. Nor do we want analogies in the well settled principles of the common law, to hold that materials provided and designed to be attached to the road, are, for the purposes of a mortgage or a conveyance, a part of the real estate itself. It is a familiar principle to all, that rails hauled on to the land, designed to be laid into a fence, or timber for a building, although not yet raised, but lying around loose, and in no way attached to the soil, are treated as a part of the realty, and pass with the land, as appurtenances. By applying these familiar principles of the common law, we may be enabled to determine what we should consider as appurtenant to the freehold, and what should pass by a conveyance of the road, and consequently what is covered by and embraced within a mortgage encumbering the road, acknowledged and recorded as a mortgage of real estate.

This case presents another question of the gravest importance as connected with the rights of the trustees or mortgagees. Here, the grantees in the trust deed, or mortgagees, claim to have taken possession under the mortgage, with the consent of the mortgagors, before the rights or lien of these creditors had intervened, and that they are now operating the road as mortgagees in possession. The facts are, that, in June, 1857, the company—being in default by the non-payment of the interest due on the first and second mortgage bonds, whereby the whole of those bonds became due by the express provisions of the mortgage—executed, by its president, Mr. Bushnell, a deed of possession, to the trustees named in the mortgage, whereby it placed in their hands the road and its appurtenances, and all its personal property of every description procured for the use of the road ; and the trustees, without going upon the road, personally, appoint Mr. Bushnell their agent, and attorney in fact, to run and operate the road for them, and that Mr. Bushnell immediately undertook the charge thus confided to him, and notified the superintendent of the road of the change of possession, continued him in his position, and caused printed notices to be posted along the road, of the same fact, and thenceforward continued for more than a year before this judgment was obtained, to operate the road as the agent and attorney of the trustees. No visible change was made in the conduct or management of the road, the same officers and employees being continued in the conduct of it. It is insisted that this was not a sufficient change of possession to affect third persons. We

Palmer *v.* Forbes et al.

think this change of possession was sufficient.   It was not neces-
sary that the trustees should come on to the ground and take
the personal supervision of the running of the road, and dis-
charge all the old officers and employees of the road, whose
knowledge of its business, connections and affairs generally, en-
dowed them with peculiar qualifications to operate the road to
the best possible advantage.   Indeed, we think no other judi-
cious course was open before them, till others could become
qualified to conduct the business understandingly.    Even an
assignee for the benefit of creditors may appoint the assignor to
close up the business, without rendering the assignment necessa-
rily void, although that may properly be considered as one evi-
dence of fraud, but it is certainly not conclusive evidence of it.
In this case we see not the slightest evidence of actual fraud,
but it was manifestly done with the honest purpose of allowing
the mortgagees to reap the legitimate fruits of the mortgage.
The necessities of the case almost compelled the trustees to
avail themselves of Mr. Bushnell's services, whose familiarity
with the road, its business and employees, certainly rendered it
prudent to secure his services.   From the nature of the case, no
apparent change could take place in the management of the road
without deranging its business and operations.   We agree with
the jury that the transfer of the possession of the road to the
trustees was actual and *bona fide*.

We find then, in June, 1857, the trustees or mortgagees in
possession of the mortgaged property, for condition broken.
And the important question arises, what are the rights of trustees
under such circumstances ?   Can they run the road and exercise
the franchises of the company, the mortgagor ?   It is evident
that all parties have from the beginning looked upon this as an
embarrassing question.   This embarrassment grows out of the
intervening rights of the public.   A franchise granted by law
to a corporation or an individual, has been considered as inalien-
able, except with the consent of the law-making power.   It has
been treated as a special trust confided to select hands, and not
to be entrusted to casual hands, who might purchase of the
grantee or donee of the franchise.   That the public have an
interest in its exercise, and must have assurance that it will not
be abused by those who are to exercise it.   The embarrassments
felt as growing out of this subject are manifested by certain
provisions in the mortgages or trust deeds, and also in the deed
delivering possession to the trustees, and in their power of
attorney appointing Mr. Bushnell as their substitute in  the
management of the property.   The mortgage or trust deed,
after the proper recitals, grants, bargains, sells, transfers and
conveys, all the road and its appurtenances, and all property pro-

vided for the use of the road, all choses in action, and the franchises of the company, to have and to hold the same upon the following trusts : that if the party of the first part should fail to pay the principal or interest due on the bonds secured by the mortgage or the sinking fund, then the whole amount of the principal should become due, and after sixty days, and upon the request of any bondholder, the trustees might enter and take possession of the mortgaged premises, " and as the attorneys in fact or agents of the said Northern Cross Railroad Company, by themselves, or agents, or substitutes, duly constituted, have, use and employ the same," making repairs and additions, etc., and after deducting the expenses, apply the proceeds towards the payment of the indebtedness secured by the mortgage, or the trustees may, on the written request of the holders of ten per cent. of the indebtedness, advertise and sell the property, and make a good conveyance of the same, subject to the first mortgage, and to restore or pay over the excess of the proceeds, if any, after paying the specified indebtedness, to the mortgagor. This clause which authorizes the trustees to conduct the business as the agents or attorneys in fact of the railroad company, it is insisted, made the possession and operation of the road by the trustees, the possession of the company, making it liable for the debts contracted by the trustees in managing the road, and the property still liable to be seized for the payment of these or any antecedent debts of the company. We were at first impressed with this suggestion, but on a more careful examination and reflection, we are satisfied that the position is not tenable. In order to ascertain the true intention of the parties, and the real nature of the transaction, we must look to the instrument by which the possession of the road was surrendered to the trustees as well as to the trust deed under which the right to the possession accrued. This deed recites the execution of the two mortgages, and of the bonds mentioned therein, the default of the company, and the demand of possession by the trustees, under the mortgage. The deed then transfers the whole of the property to the trustees, and authorizes them to take possession thereof, and all the rights and franchises of the company, to have and to hold the same for the uses and purposes contemplated by the two recited mortgages. And the trustees covenant that they will continue to run, use and occupy the road, in the name of, and as the attorneys in fact and agents of the road, and after paying the expenses, to apply the proceeds as specified in the deed, and when the specified indebtedness is paid, to surrender the road and property to the company, reserving the right of the bondholders to demand a sale of the property as provided in the mortgages.

The doubt existing as to what extent the trustees in possession, as purchasers under the mortgage, might use and exercise the franchises of the corporation in running and operating the road, manifestly led to the insertion of the provisions, upon which the present objection arises. Had there been no doubt that the trustees or purchasers might, in their own names, have exercised all the franchises and enjoyed all the rights and immunities, conferred upon the company by the charter, there is no probability that any provision would have been made for the use of the company's name, in the management of the business of the trust. Without at this moment saying to what extent the trustees in possession might, in their own name, use and operate the road, and exercise and enjoy the franchises granted by the legislature to the company, it is manifest that they could only enjoy some of the rights granted in the deeds of trust and possession, by using the name of the company. For instance, the choses in action could only be collected by the use of the name of the company. It does not necessarily follow, that all which is done in the name of a party is done for him and his benefit, or even to enforce his rights, although the person doing it may, in form, act as the agent or attorney of the one whose name is used. Even a court of law will regard and protect the rights of an assignee, though he may be obliged to use the name of the assignor, to enforce or enjoy the rights assigned. But the mortgage does not provide that the trustees should take possession of the property as the attorneys and agents of the company, nor does the deed of possession grant and convey to them the title and possession of the property, as such attorneys and agents, but these are granted to them positively and absolutely, as trustees, and for the uses specified and declared; but the trustees covenant that they will use the property in the name of and as the attorneys and agents of the company. This was evidently not designed to affect or give character to the title or possession of the property to be held by the trustees, but to the mode, manner and form of using it. It was supposed that the use of the company's name, and the enjoyment of the company's franchises, in the running and managing of the railroad and business, could only be done in the form of an agency, and hence that form was adopted for the real and *bona fide* object of carrying out the trust provided for in the deeds. If this assumption was correct, then it inevitably follows, that this mode of doing the business was right and proper, for the idea that there is no mode in which the trustees or purchasers could carry on and operate the business of the road, cannot for a moment be listened to in a court of justice. And even if the assumption was wrong, so long as it was entertained and acted upon, it no more affects the

good faith of the transaction, than if it were true, and as to some portion of the business confided to the trustees, it was undoubtedly true.

In authorizing the construction of this road, and the execution of these mortgages, the legislature had two objects in view. The first was to secure the construction and operation of a railroad, and to the people the enjoyment of its use, upon paying a reasonable compensation therefor; and the other was, to secure to those who should loan money to the company to enable it to construct and equip the road, the means of enforcing the repayment of the money which they should thus advance, by appropriating, if need be, the road and other property of the company to that object. The first object would seem to forbid the idea that the mortgagees, or purchasers under them, could take up the road and dispose of the material, so as to deprive the public of its use, whose sovereign powers had been exercised in the condemnation of private property for the construction of the road. If it was the intention that the road should not be taken up and destroyed for the payment of the mortgage debt, but that it should be sold subject to the duty towards the public of continuing and operating it as a road, it follows necessarily, that it was the intention of the legislature that those into whose hands the road might fall, and upon whom this duty to the public of running and operating the road would devolve, should possess all the necessary rights and powers to enable them to perform this duty. The authority to mortgage implies the authority to sell the thing mortgaged, and to convey to the purchaser all needful powers to use the thing purchased, in a proper and beneficial manner. To this extent at least, we entertain no sort of doubt of the rights of the trustees or purchasers. If this right were withheld, we must allow, nay, we necessarily compel the road to be taken up and the material to be sold to pay the mortgage, or else compel the parties to resort to shifts and colorable proceedings which subjects them to the imputation of indiscretion and fraud, as we find exhibited in this record. Perhaps it is not too much to say, that the extent of right conferred upon the company for the purpose of enabling it to finish, repair and operate the road, was designed to be impliedly conferred upon the mortgagees in possession or purchasers under the mortgage, to enable them to accomplish the same object; but it is not necessary now to say this, but we do say unhesitatingly, that the trustees or purchasers are endowed with sufficient powers which are undoubtedly in the nature of a franchise, to enable them to discharge the duty which the public have a right to demand of them, by keeping in repair, maintaining and operating the road, and to demand and receive a suitable reward therefor, and for this

purpose they may use their own proper names, or adopt any other convenient business name, as any other individual or company may do, and they are under no necessity of adopting the name of the company to whose rights in the property they have succeeded.

In the case before us, the trustees took possession of the property as they had a right to do under the mortgage, long before the judgment was rendered upon which the execution was issued, under which the marshal seized and took away the portion of the property which belonged to the road at the time of the transfer of the possession under the mortgage. From that time, even that portion of it which should be treated and considered as not appurtenant to the real estate, was not subject to be taken for the payment of the general debts of the company, and that portion which was purchased and brought on to the line of the road by the trustees, after they took possession, of course was theirs for the purposes of the trust, and no more liable for the debts of the company than was the property of any third person. Indeed the whole defense depended upon impeaching the good faith of the transaction, and showing that no actual and legal transfer of the property to the trustees had taken place under the mortgage, and in the argument and reference to authorities on this point, this case was confounded with the case of an assignment of a debtor in failing circumstances to a trustee for the benefit of his creditors, whereas there is no analogy between the two cases. These trustees took possession as mortgagees, for condition broken, in pursuance of their right distinctly expressed in the trust deed, and the duties of mortgagees in possession are imposed upon them, not only by the law, but by the special provisions of the trust deeds and the deed of possession, and these rights and duties are very different from those of an assignee of a failing debtor for the benefit of his creditors. The former are not bound to know, and indeed have no right to know, that there are any debts except the mortgage debt, and when that is paid, they must surrender all the residuum to the debtor. Whereas the latter must take notice of all the liabilities of the debtor, or at least all those that come to his knowledge, whether mentioned in the assignment or not, and any provision in the assignment, giving the debtor the remainder before all these are satisfied, would be in law a fraud, and would invalidate the whole assignment. We think the verdict was properly found for the plaintiffs, and the judgment must be affirmed.

*Judgment affirmed.*

WALKER, J. I fully concur in the conclusion at which the court has arrived in this case. And also in the reasoning by

which that conclusion is reached, so far as it relates to the property having vested in the trustee, by his reducing it into actual possession under the deed of trust, before any lien had attached upon it. I also concur with the majority of the court in holding that the engines, tenders, cars and rolling stock on the road, and all other property in existence at the time of the execution of the deed of trust, which was attached to and permanently connected with the road, may be regarded as real estate, and passed by the conveyance of the road. But I am unable to concur in the opinion that iron rails, chairs, spikes and ties, drawn upon and not attached to the road, but intended so to be, savor of the realty, or pass with it, by conveyance. But on the contrary, that such articles are personal property in the hands of the road, and subject to the same rules that govern other chattels.