THE BOARD OF COMMISSIONERS OF TIPPECANOE CO. ET AL. *v.* THE LAFAYETTE, MUNCIE, AND BLOOMINGTON RAILROAD CO. ET AL.

ULTRA VIRES.—*Parties.*—*Railroad.*—*Transfer of Part of Railroad.*—The L., M. & B. Railroad Company, organized to construct, own, and maintain a railroad from Muncie, Indiana, by way of Lafayette, to the western boundary of the State, in the direction of Bloomington, Illinois, by a written agreement with the L., B. & M. Railroad Company, organized to construct a railroad from Bloomington, Illinois, to the eastern boundary of that State, in the direction of Lafayette, Indiana, transferred, granted, and conveyed to the latter company, its lessees, successors, and assigns, for the period of ninety-nine years, renewable at the pleasure of the latter company, the exclusive right to transport passengers and freight over that part of the railroad of the former company lying between Lafayette and the western state line, with possession thereof, the said latter company to use and maintain said part of said road, pay the taxes thereon, perform certain contracts theretofore made by the former company, and pay to the former company, or for its use, certain sums of money, said agreement being made by the directors and officers of said companies, without the consent of their stockholders. Said latter company assigned said agreement to the T., W. & W. Railroad Company, owning and operating a railroad run-

The Board, etc., Tippecanoe Co. *et al. v.* The Lafayette, etc., R. R. Co. *et al.*

ning from Toledo, Ohio, to Quincy, Illinois, by the way of Lafayette, Indiana.

*Held,* that said agreement was *ultra vires* and void.

*Held,* also, that an action would lie, on behalf of a stockholder of the L., M. & B. Railroad Company, without previous demand by him for redress on the directors of said company and refusal by them, against all said companies, for an injunction and to declare void said agreement and assignment, and that the fact that after the commencement of such action the L., M. & B. Railroad Company filed a cross complaint therein, seeking the same relief, was not a sufficient answer, on behalf of the other two companies, to the original complaint.

PLEADING.—*Cross Complaint.*—In the making up of the issues and in the trial of questions of fact, the court is governed by the same principles of law and rules of practice in reference to a cross complaint as in regard to the complaint.

SAME.—*Abatement.*—Where a suit has been properly brought in the commencement, the defendant cannot cause its abatement by afterwards creating a state of facts against the ability of the plaintiff to sue.

CORPORATION.—*Want of Power.*—Where a want of power is pleaded *in favor* of a corporation to defeat the payment of the consideration for benefits which it has received and enjoyed, the courts will go as far as is consistent with law to uphold the contract, for the purpose of maintaining justice, equity, and good conscience; but where the want of power is pleaded *against* the corporation to prevent wrong, the corporation will be held to the strictest rules of law.

From the Tippecanoe Civil Circuit Court.

*Z. & S. P. Baird, Wilson & Adams, S. A. Huff,* and *R. Jones,* for appellants.

*Baker, Hord & Hendricks, J. R. Coffroth, W. Z. & T. A. Stuart,* and *McDonald & Butler,* for appellees.

BIDDLE, J.—This case was originally brought by the Board of Commissioners of Tippecanoe County, as a stockholder in the Lafayette, Muncie, and Bloomington Railroad Company. Certain proceedings were had, and changes in the pleadings made, which need not be noticed in detail. The case comes before us on the original complaint, in three paragraphs, with the appellants herein as plaintiffs, and the appellees as defendants below, and with an answer to the original complaint of one special paragraph, to which a demurrer was filed for want of alleged facts, and overruled; exception taken, and judgment on the demurrer for the appellees. Appeal.

During the proceedings, a cross complaint was filed by the Lafayette, Muncie, and Bloomington Railroad Company, against the Toledo, Wabash, and Western Railway Company and the Lafayette, Bloomington, and Mississippi Railroad Company, which comes before us upon demurrer for want of alleged facts, sustained, exception taken, and judgment on demurrer for appellees; appeal.

The original complaint and cross complaint both pray for an injunction, and that a certain agreement and assignment be declared void; also, for an account taken, and other relief. The agreement and assignment are as follows:

"This agreement made and entered into this 4th day of October, 1871, by and between the Toledo, Wabash, and Western Railway Company, of the first part, and the Lafayette, Bloomington, and Mississippi Railway Company, of the second part, witnesseth: that whereas the said second party did, on the 30th day of September, 1871, enter into a covenant, agreement, or lease, with the Lafayette, Muncie, and Bloomington Railroad Company, in words and figures as follows, to wit: ' This indenture, made this 30th day of September, A. D. 1871, by and between the Lafayette, Muncie, and Bloomington Railroad Company, a corporation duly organized under the laws of the State of Indiana, party of the first part, and the Lafayette, Bloomington, and Mississippi Railway Company, a corporation duly organized under the laws of the State of Illinois, party of the second part, witnesseth: that the party of the first part, in pursuance of a resolution of its board of directors, adopted on the 1st day of August, A. D. 1871, and in consideration of the covenants and agreements on the part of the party of the second part, hereinafter contained, hereby covenants and agrees, to and with the party of the second part, its lessees, successors, and assigns, that it, the said party of the first part, will, prior to the 1st day of January, A. D. 1872, construct and complete ready for use by the cars of the western division of its railroad, to wit, from the Toledo, Wabash, and Western Railway at Lafayette, Indiana, to the state line between the states of Indiana and Illinois, to the point of

meeting and connecting with the railway of the party of the second part, a distance of thirty-seven and one-tenth miles, to be known as and called the Western Division of the Lafayette, Muncie, and Bloomington Railroad, in the manner following, that is to say : The width of the right of way to the canal at Lafayette, to be forty feet, which is the minimum width on the entire said western division, and not to exceed three miles in all shall be less than one hundred feet. The bridges, culverts, cattle-guards, and all other structures, for the said western division of said railroad, shall be of good material, and built in a substantial and proper manner. There shall be two thousand six hundred and forty cross-ties per mile, eight feet long, six inches thick, and facing at least six inches on both sides. The iron to be of good quality, fifty-six pounds to the yard, and well laid with fish-joint splices. There shall be six station houses built west of Lafayette, at proper stations to accommodate the business of the road, eighteen by forty-two feet in size, and planned and finished to the approval of the chief engineer of the party of the first part; also, proper switches and side-tracks, not less than eleven thousand feet in length in the aggregate, shall be put in at the stations, and two good and substantial water-tanks, covered and protected, shall also be erected at proper points and supplied with permanent water for the use of the road. The track shall be well surfaced up, and part of it, for twelve miles west of Lafayette and through the clay cuts and fills at and near Oxford, not exceeding three and one-half miles, well ballasted with gravel from the road-bed west of the Wabash river, to be taken out so as to reduce the grade to fifty-five feet to the mile.

" ' The said entire western division of said road, with all the above named structures and buildings, shall be constructed and completed as a first class western railroad, to a standard requisite for the efficient and successful operation of the same, and in all respects equal to the Decatur and St. Louis division of the Toledo, Wabash, and Western Railway.

" ' Said party of the first part further agrees to cause its chief

engineer to ascertain the actual cost of fencing on both sides, in a good and substantial manner, the entire track of said western division, from the west side of the Wabash river to ·the Illinois state line, and from the amount thereof to deduct the cost of ballasting said track with gravel as aforesaid, if taken out of the sides of the cut just west of the Wabash; and the residue of the ascertained cost of said fencing of the entire line shall be expended in the erection of fences on said western division at such places as will best protect the stock of the country through which the same runs.

" ' The said party of the first part, in pursuance of said resolution and in consideration of the covenants and agreements on the part of the said party of the second part, hereinafter contained, hereby grants and conveys to said party of the second part, its lessees, successors, and assigns, the exclusive right to transport freight and passengers over and upon the said western division of the said Lafayette, Muncie, and Bloomington Railroad, and the exclusive use of said western division, for the term of ninety-nine years from this date, and renewable at the pleasure of the party of the second part, subject, nevertheless, to the right of the Cincinnati, Lafayette, and Chicago Railroad Company, under the contract between it and the party of the first part, dated July 20th, 1870, as modified by the contract of the same parties dated August 15th, 1871, in regard to the use of that part of said western division between Lafayette and Templeton, and subject, also, to the right of said party of the first part, at its option, to use the track between the Toledo, Wabash, and Western Railway and the Wabash river, at Lafayette, for its business connected with its eastern division, to wit, that part of its road lying between the Toledo, Wabash, and Western ·Railway and Muncie, it being understood and agreed that such use of the track by said party of the first part shall be subordinate to and shall not interfere with the regular trains of the party of the second part, its lessees, successors, or assigns, and for which use said party of the first part shall pay monthly to the party of the second part, on or before the 15th day of each month, a rea-

sonable compensation to be agreed upon between the parties, and in case of their disagreement, then such compensation as a disinterested, competent party shall decide to be fair and equitable.

"'And said party of the first part hereby conveys, assigns, and transfers to said party of the second part, its lessees, successors, and assigns, all benefit and advantage to be derived from said contract, so modified as aforesaid, existing between said Cincinnati, Lafayette, and Chicago Railroad Company and the party of the first part. And it is hereby declared that all payments to be made and things to be done by said Cincinnati, Lafayette, and Chicago Railroad Company, as provided for in said contract, and modifications thereof, shall inure to, vest in, and be for the use of, said party of the second part, its lessees, successors, and assigns.

"'And the said party of the second part, in pursuance of a resolution of its board of directors, adopted on the 29th day of September, A. D. 1871, and for and in consideration of the covenants and agreements on the part of said party of the first part, hereinbefore contained, hereby covenants and agrees, to and with the party of the first part, its successors, and assigns, that it, said party of the second part, will furnish the locomotives and cars and all necessary equipments for, and will run and operate in a proper manner, the said western division of said Lafayette, Muncie, and Bloomington railroad, from the Toledo, Wabash, and Western Railway, at Lafayette, to the Illinois state line, and transport freight and passengers thereon, and use the same in a lawful and proper manner, as required by the laws of the State of Indiana, during all the term aforesaid.

"'And the said party of the second part, in pursuance of the resolution aforesaid and in and for the consideration aforesaid, further covenants and agrees, to and with the party of the first part, its successors, and assigns, that it, said party of the second part, will keep and maintain said western division of said railroad, with its tracks, bridges, culverts, station houses, water-tanks, structures, buildings, fences, and appurtenances, in good order and condition, and make all necessary renewals,

repairs, and additions thereto, at its own proper cost and expense, except so far as they may be paid or reimbursed for by said Cincinnati, Lafayette, and Chicago Railroad Company, under its said contract as modified as aforesaid, and will also pay as they mature the seven per cent. per annum interest coupons upon six hundred and sixty-six bonds of one thousand dollars each, made, issued, and sold by the party of the first part, dated the 1st day of August, A. D. 1871, and to be due on the 1st day of August, A. D. 1901, to Abraham B. Baylis, or bearer, in the city of New York, in gold coin of the United States, which bonds are secured by a mortgage upon said western division of said road and all its appurtenances, said interest coupons so to be paid by said party of the second part being payable in like gold coin, semi-annually, on the first days of February and August in each year, at the office of the Toledo, Wabash, and Western Railway Company, in the city of New York.

" 'And further, the said party of the second part will pay all taxes and assessments which may be levied against said western division of said railroad. And said party of the second part further covenants and agrees, to and with the said party of the first part, its successors, and assigns, that said party of the second part will indemnify and save said party of the first part harmless from all loss, damage, and costs, to which it or they may be liable on account of any negligence or wrongful act of the party of the second part, its lessees, successors, and assigns, in the use and operation of the said western division of said railroad.

" ' But it is mutually understood and agreed, that as soon as the necessary consent can be obtained of persons owning a majority of the capital stock of said Lafayette, Muncie, and Bloomington Railroad Company, the said western division of said road, with its appurtenances, may be sold and conveyed by it to the holders of said bonds and mortgage in satisfaction and discharge thereof, and that then and thereafter this contract shall cease and be void, excepting so far only as its continuance is necessary for the protection of the rights hereby

secured to said party of the first part, for the use of the track between the Toledo, Wabash, and Western Railway and the Wabash river, and the use of part of said division by the Cincinnati, Lafayette, and Chicago Railroad Company, under the contracts hereinbefore mentioned; and upon such sale of the western division of said railroad and its appurtenances, the purchaser or purchasers thereof shall be entitled to the immediate possession, use, and occupation thereof, as against the party of the second part, its lessees, successors, and assigns.

" ' It is further mutually understood, covenanted, and agreed, that in the event that said western division of said railroad shall not be conveyed by said party of the first part to the holders of said bonds and said mortgage, in discharge thereof, said party of the first part shall pay off and discharge the principal of all said six hundred and sixty-six thousand dollars of said bonds, at the maturity thereof; and thereafter said party of the second part shall pay, semi-annually, in gold coin, to said party of the first part, its successors, or assigns, for the use of said western division, in addition to keeping the same in repair, the sum of twenty-three thousand three hundred and ten dollars, on the first days of February and August, during the continuance of this contract and of said term of ninety-nine years, and renewable thereafter.'

"Now, therefore, by this agreement, the said Lafayette, Bloomington, and Mississippi Railway Company does hereby assign, transfer,and set over to the said Toledo, Wabash, and Western Railway Company, the said contract or lease and all of the interest of the said second party in and to the same.

"And the said Toledo, Wabash, and Western Railway Company, in consideration of said assignment and transfer, does hereby undertake and agree with said second party, that it, the said Toledo, Wabash, and Western Railway Company, will fully and faithfully do and perform all the undertakings and covenants of every sort and kind which, by the said contract or lease, the said Lafayette, Bloomington, and Mississippi Railway has undertaken and agreed to do and perform.

"And the said Toledo, Wabash, and Western Railway Com-

pany hereby covenants and agrees, with the said Lafayette, Bloomington, and Mississippi Railway Company, in consideration of said assignment and transfer of said contract or lease, to save and keep harmless the said Lafayette, Bloomington, and Mississippi Railway Company, on account of any and all liability assumed by said Lafayette, Bloomington, and Mississippi Railway Company by said contract or lease."

The original complaint seeks to have the agreement declared void, on the ground of fraud in the directors and officers of the railroad company making it, with other persons, the facts of which are formally alleged, and also because it is *ultra vires*. The cross complaint seeks to avoid the agreement, simply because it is *ultra vires*, the grounds of which are formally averred.

It is also alleged, that the Lafayette, Muncie, and Bloomington Railroad Company is a corporation organized under the general law of the State of Indiana, for the purpose of constructing, owning, and maintaining a railroad from Muncie, Indiana, by the way of Lafayette, to a point on the line dividing the states of Indiana and Illinois, in the general direction toward Bloomington, Illinois; and that about the same time the Lafayette, Bloomington, and Mississippi Railroad Company was organized, under a special charter granted by the legislature of Illinois, for the purpose of constructing a railroad from Bloomington, Illinois, to a point on the line dividing the states of Illinois and Indiana, in the general direction toward Lafayette; the Toledo, Wabash, and Western Railway Company then and still being a company owning and operating a railroad running from Toledo, in Ohio, by the way of Lafayette, Indiana, to Quincy, Illinois.

The agreement, which is attacked, was made by the companies which are parties thereto, by their directors and officers, without the consent of the stockholders.

The averments in the special answer to the original complaint are as follows:

" That said plaintiffs sue as stockholders of the Lafayette, Muncie, and Bloomington Railroad Company, a corporation

organized and existing under the laws of Indiana, to enforce certain alleged rights of the corporation which, if they exist, constitute a cause or causes of action in favor of said railroad company itself, and do not constitute a cause or causes of action in favor of any or all of the stockholders of said corporation, unless it is made to appear that the directory of said corporation, in violation of their trusts as such directors, and to the prejudice of the rights of the stockholders, refuses, after proper demand made, to enforce such right by action in the name of said corporation ; that when this action was instituted and commenced, the board of directors of the Lafayette, Muncie, and Bloomington Railroad Company aforesaid, consisted of the following named persons, to wit: William Lingle, Owen Ball, Martin L. Pierce, Henry T. Sample, James H. Telford, W. J. Templeton, John Green, Joseph Buckles, C. E. Shipley, John Purdue, Adams Earl, Moses Fowler, and Hiram W. Chase ; and the plaintiffs' complaint alleges that this board of directors, under the fraudulent manipulations, and to promote the private interests of three of its members, to wit, Earl, Fowler, and Chase (who in their individual capacities are defendants in this action), had grossly violated the trust committed to said board, and threatened to commit other and further acts in violation of said trust, to the great injury of the plaintiffs and other stockholders of the Lafayette, Muncie, and Bloomington Railroad Company aforesaid ; that after the commencement of this action, and during the pendency thereof, to wit, some time in the month of September, 1872, a new election was held by the stockholders of said railroad company, for the purpose of electing a new board of directors for said company ; and at said election the plaintiffs in this action, and other stockholders of said company, duly and legally elected a new board of directors of and for said company, consisting of the following named persons, and no others, to wit : Oliver W. Pierce, John W. Heath, James B. Falley, William C. Wilson, Isaac Lewis, Alexander Wilson, John W. Martin, Joseph Heath, Henry T. Morris, Samuel P. Anthony, John Green, Frederick Geiger, and Hiram Shaw ; and that the above

named persons were so elected as the board of directors of said railroad company, with the assistance of the votes of the said plaintiffs as stockholders therein, and that said board immediately after its election, and in the month of September, 1873, assumed the management of the corporate business affairs and franchises of said railroad company, and have ever since had and still have full and complete control of said company, its corporate property, business, and franchises; that said board of directors of said company, so elected in September, 1873, and also the board of directors elected at the last annual election in July, 1874, were, at the time of their election, and ever since have continued to be, and still are, in complete accord and harmony with the plaintiffs in this action, and with a majority in number and interest of the stockholders of said company, as to the management of its affairs, and as to the seeking of redress by legal proceedings for the supposed wrongs and injuries complained of by the plaintiffs in the complaint filed in this cause; that the present board of directors of said company, so elected and so now controlling said company as aforesaid, not only do not refuse, fail, or neglect to seek redress by proceedings for the supposed cause of action declared upon in the plaintiffs' complaint, but on the contrary thereof respondents say that soon after the election of said board of directors, and at the September term, 1873, of this court, the said board caused a cross complaint to be filed in this cause against respondents, in the name and on behalf of the Lafayette, Muncie, and Bloomington Railroad Company aforesaid, in which cross complaint substantially the same relief is prayed that the plaintiffs seek in and by their complaint filed in this cause; and by reason of the matters herein alleged, respondents say that the Lafayette, Muncie, and Bloomington Railroad Company aforesaid, while nominally a defendant in this action, is in reality performing the functions of a plaintiff, and is, as a defendant, by its cross bill, seeking to obtain the same relief that the plaintiffs as stockholders are seeking in the same action; wherefore these respondents insist that the plaintiffs never had the legal capacity to sue in this action, and if such

capacity to sue did exist at the commencement of this action, it ceased when the said board of directors were elected and assumed control of the business affairs and franchises of the corporation as aforesaid."

Assignment of errors by the appellants, plaintiffs in the original complaint:

1. The court erred in sustaining the motions of the appellees to strike out parts of the third paragraph of their complaint.

2. The court erred in overruling the demurrer of these appellants to the first paragraph of the answer of the appellees, and in rendering final judgment thereon.

Assignment of errors by the appellant who is the plaintiff in the cross complaint:

1. The court erred in sustaining each of the motions made by the appellees named (who are defendants to said cross complaint), to strike out parts of the cross complaint.

2. The court erred in sustaining the demurrers to said cross complaint, and in rendering final judgment thereon.

The appellants make the following points:

" 1. A charter granted to a railway corporation for the purpose of constructing, owning, and maintaining a railroad, confers a trust special to the corporators in relation to the purposes of its creation, and hence such a corporation has no power to enter into contracts foreign to those for which it was created, or to delegate its franchises, or to incapacitate itself to discharge its duties to the public by a lease or sale of its road. Agreements of that character, unauthorized by its charter, are inconsistent with the obligations of the corporation to the public, *ultra vires,* and void.

"Hodges Railways, 63; 2 Kent Com. 299; *Colman* v. *Eastern Counties R. W. Co.,* 10 Beav. 1; *Beman* v. *Rufford,* 1 Sim. N. s. 550; *The Great Northern R. W. Co.* v. *The Eastern Counties R. W. Co.,* 9 Hare, 304; *Winch* v. *Birkenhead, etc., R. W. Co.,* 13 Eng. L. & Eq. 506; *East Anglian R. W. Co.* v. *The Eastern Counties R. W. Co.,* 11 C. B. 775; *MacGregor* v. *The Official Manager, etc.,* 16 Eng. L. & Eq. 180; *TheShrews-*

*bury, etc., R. W. Co.* v. *The North-Western R. W. Co.*, 6 H. L. Cas. 113; *Bissell* v. *The Michigan Southern, etc., R. R. Co.*, 22 N. Y. 299; *Bank of Augusta* v. *Earle*, 13 Peters, 587; *Pearce* v. *The Madison, etc., R. R. Co.*, 21 How. 441; *The Union Bridge Co.* v. *The Troy, etc., R. R. Co.*, 7 Lansing, 240; *Buffett* v. *The Troy & Boston R. R. Co.*, 40 N. Y. 180; *Richardson* v. *Sibley*, 11 Allen, 65; *Black* v. *The United Companies of New Jersey*, 4 Amer. Law Times, 236; *Salomons* v. *Laing*, 12 Beavan, 353; *Bagshaw* v. *The Eastern Union R. W. Co.*, 2 Macn. & G. 389; *The York, etc., R. R. Co.* v. *Winans*, 17 How. 30; *The Shelbyville, etc., Turnpike Co.* v. *Barnes*, 42 Ind. 498.

" 2. We have thus far treated the question as though the execution of the lease had been the act of the corporators. The cross complaint alleges, and the demurrer admits, that the execution of the lease was the act of the directors, transacted without the knowledge or consent of the corporators, and in betrayal of their interest and wishes. Now, admitting that the corporators had authority to step outside of their charter, and sell their road and abandon the enterprise in which they had embarked, it does not follow that the directors elected to manage the business of the road, with reference to the purposes of its creation, had any such authority. We therefore insist that the lease is void, not only as against the State, but as against the corporators, as having been executed in excess of the authority which they had conferred upon their directors. It is conceded by all authority, that the directors of a railway or other corporation are the agents of the shareholders, and can exercise no powers not conferred upon them by the charter, without the consent of the shareholders. This court, in the late case of *The Board of Comm'rs of Tippecanoe Co.* v. *Reynolds*, 44 Ind. 509, decided that the directors of a railway corporation occupy the relation to the shareholders of agents. In that case, the court said : ' It seems to us, however, keeping in view the current of authorities, that notwithstanding the general language employed in the above cases, for some purposes,

the directors of a corporation stand in a relation similar to that of trustees for the shareholders. This seems to be the case in reference to the management, by the directors, of the property and general affairs of the corporation.' See, also, Perry Trusts, sec. 207 ; Angell & A. Corp., secs. 312–313 ; *Verplanck* v. *Mercantile Ins. Co.*, 1 Edw. Ch. 84, 87 ; *European, etc., R. W. Co.* v. *Poor*, 59 Me. 277 ; *Scott* v. *Depeyster*, 1 Edw. Ch. 513 ; *The Great Lux. R. W. Co.* v. *Magnay*, 25 Beavan, 586 ; *Wright* v. *Bundy*, 11 Ind. 398 ; *Clay* v. *Rufford*, 19 Eng. L. & Eq. 350 ; *The Bedford R. R. Co.* v. *Bowser*, 48 Penn. St. 29 ; *Eidman* v. *Bowman*, 58 Ill. 444 ; *Railway Co.* v. *Allerton*, 18 Wal. 233 ; *Balfour* v. *Earnest*, 5 C. B. N. S. 601 ; *Cohen* v. *Wilkinson*, 1 Macn. & G. 481.

" In the case of the *Salem Bank* v. *Gloucester Bank*, 17 Mass. 1, the Supreme Court of Massachusetts said : ' The case of *Wyman* v. *The Hallowell and Augusta Bank*, 14 Mass. 58, recognizes a distinction between acts of an agent for his principal in common cases, and similar acts done by the servants or officers of a corporation. And there is reason for this distinction ; for in the first case, the extent of the authority is known only between the principal and the agent; whereas in the latter the authority is created by statute, or is matter of record in the books of the corporation, to which all may have access who have occasion to deal with the officers.'

" The same precise point is decided in the following cases above cited : *MacGregor* v. *The Official Manager, etc.*, 16 Eng. L. & Eq. 180 ; *Pearce* v. *The Madison and Indianapolis R. R. Co.*, 21 How. 441 ; *Eidman* v. *Bowman*, 58 Ill. 444 ; *Railway Company* v. *Allerton*, 18 Wal. 233.

" 3. But it is contended that these principles of law, so necessary to protect the public against the frauds and depredations of corporate managers, suggested by the wisdom and experience of ages, have been swept from existence in Indiana by legislative enactments.

" Section 3 of an act approved February 23d, 1853, entitled 'an act to authorize railroad companies to consolidate their stock with the stock of railroad companies in this or in an

adjoining State, and to connect their roads with the roads of said companies, and to authorize railroad companies to construct their roads on the routes which they may have heretofore surveyed and located, and to use and occupy the same when completed,' 2 G. & H. 526, is relied upon.    That section provides, ' that any railroad company heretofore organized, or which may hereafter be organized under the general or special laws of this State, and which may have constructed, or commenced the construction of their road so as to meet and connect with any other railroad in an adjoining state at the boundary line of this State, shall have the power to make such contracts and agreements with any such road constructed in an adjoining state, for the transportation of freight and passengers, or for the use of its said road, as to the board of directors may seem proper.'

" This section of the act, say adverse counsel, fully authorizes directors of railway corporations to execute perpetual leases of their roads, without the consent of the shareholders or the public.    If this construction of the section is warranted, it not only repeals by implication highly conservative provisions, above referred to, of the general act of this State, providing for the incorporation of railroads, but is in derogation of the common law.    Certainly, no court will give the section such a construction, unless compelled to do so by the clear and manifest import of its language.

" The object of the section seems to be to authorize Indiana corporations to arrange for the transportation of freight and passengers in other states and beyond their chartered *termini,* which, perhaps, they would have had no authority to do in its absence.    *Bissell* v. *The Michigan Southern, etc., R. R. Co., supra,* and *Hood* v. *The New York, etc., R. R. Co.,* 22 Conn. 502.    This view is strengthened by the consideration that the section requires, as a condition of the exercise of the power, that the road of the foreign corporation be constructed and in a condition to perform its part of the contract.    Had the intention of the legislature been to grant the power to lease or sell, it would have been immaterial whether the road of the foreign

corporation was constructed or not. The point here made was in the mind of the legislature ; for the first section of the act, relating to consolidation of railroads, provides, ' that any railroad company in this State shall have the power to intersect, join, and unite their railroad with any other railroad constructed, or in the process of construction,' etc. ; whereas, in the third section of the act, as a condition of the exercise of the power, it is required that the road of the foreign corporation be constructed. Adverse counsel insist that the word ' constructed ' be stricken from the third section as having no meaning. For this we submit there is no authority. It is averred in the cross complaint, and admitted by the demurrer, that the road of the Illinois corporation was not constructed when the lease was executed.

" The very construction which we here insist upon was given to the third section of the act by this court in the case of *Smead* v. *The Indianapolis, etc., R. R. Co.*, 11 Ind. 104.

"4. There can be no pretence that the Lafayette, Muncie, and Bloomington Railway Company are estopped in this case from disputing the validity of the lease in question. There is no estoppel by deed, for no valid or binding deed was ever executed. If we are right in the proposition first above discussed, the transaction is void as in contravention of public policy, and the lease of no more force and effect than if it had never been executed. The law on this question is stated with force and precision, by STORER, J., in the above cited case of *The O. & M. R. R. Co.* v. *The Ind. & Cin. R. R. Co.*, 5 Am. L. Reg. N. s. 733 : ' But where a body of individuals is vested with power only to engage in a special business, any attempt on the part of such a corporation to change the object of their association, or undertake new and distinct pursuits from those described in their organic law, such assumptions are *ipso facto* illegal, and whenever brought to the notice of the courts by third persons, or the parties themselves to the contract, will not be sustained. In such cases there is no estoppel, for there is no legal competency in the contracting parties ; and the affirmance, or disaffirmance, of their acts, by matter *in pais*, or

by corporate resolutions, can give no validity to that which never legally existed. If a corporation could be estopped from setting up its want of authority to enter into contracts made by its agents, its power might be indefinitely enlarged, and what it was not permitted to do by its charter would become obligatory by its acquiescence.'

" The defence of *ultra vires* was .allowed to shareholders in railway corporations, standing upon the record in their corporate names, in the following well considered cases: *The East Anglian R. W. Co.* v. *The Eastern Counties R. W. Co.*, 11 C. B. 775; *The Great Northern R. W. Co.* v. *The Eastern Counties R. W. Co.*, 9 Hare, 306; *MacGregor vi The Official Manager, etc.*, 16 Eng. L. & Eq.. 182; *Pearce* v. *The Madison and Indianapolis R. R. Co.*, 21 How. 441.

" These cases were all decided by courts of the highest authority. It is well said, by SELDEN, J., in *Bissell* v. *The Michigan Southern and Northern Indiana R. R. Co.:* ' In England this question has been before every judge and every court, has been presented in every possible form, and argued by men of the highest talent, and the result has been uniformly the same. If it is possible to settle this question by authority, this must settle it at least in that country.'

"Angell & Ames, in their work on corporations, sec. 256, say: ' Nor is a corporation, in such case, when an action is brought against them on a contract, estopped, by the consideration they have received, from denying their competency to make the contract; for if so, the estoppel would apply equally to the other contracting party, and the limitation upon the power of the corporation would be of no avail.' See, also, Pierce Am. R. R. Law, 395."

The appellees make the following points:

" 1. The rule as to what is necessary, in cases like the present, to enable stockholders to sue on a cause of action belonging to the corporation, is laid down as follows, by the Supreme Court of the United States, in *Memphis City* v. *Dean*, 8 Wal. 73, viz. :

" ' The judgment in the case of *Dodge* v. *Woolsey* authorizes

the stockholder of a company to institute a suit in equity in his own name against a wrong-doer, whose acts operate to the prejudice of the interests of the stockholders, such as diminishing their dividends and lessening the value of their stock, in a case where application has first been made to the directors of the company to institute the suit in its own name, and they have refused. This refusal of the board of directors is essential in order to give to the stockholder any standing in court, as the charter confers upon the directors representing the body of stockholders, the general management of the business of the company. There must be a clear default, therefore, on their part, involving a breach of duty, within the rule established in equity, to authorize a stockholder to institute the suit in his own behalf, or for himself and other stockholders who may choose to join.

" See, also, *Bronson* v. *LaCrosse, etc., R. R. Co.*, 2 Wal. 283; *Dodge* v. *Woolsey*, 18 How. 331; *Robinson* v. *Smith*, 3 Paige, 222; Angell & Ames Corp., sec. 312; *Brewer* v. *Boston Theatre*, 104 Mass. 378.

" 2. A cross bill is a mode of defence to the original bill. It is an auxiliary or dependency upon the original suit, and not a reiteration by the defendant, who ought to be a plaintiff, of the allegations of the original bill. Story Eq. Pl., secs. 393 and 399; *Cross* v. *De Valle*, 1 Wal. 1; Dan. Ch. Prac. 1649, 1652.

" For the reasons already given, and on the strength of the authorities before cited, we insist:

" 1st. That the plaintiffs, as is shown by the record, never had a right to sue in their own names.

"2d. That if such right to sue existed at the time of the commencement of the action, it ceased before the filing of the appellees' answer, when a new board of directors was elected, who were willing to act in harmony with the plaintiffs in relation to the matters in litigation in this action.

" 3. The first question is one of power.

"Do the statutes of Indiana authorize or provide in any manner for railroad leases, allowing railroads to lease or to be

leased ? This inquiry will involve whatever may have been done analogous to leasing.

" 1st. Thus, the statutes of Indiana make explicit provision for the consolidation of railroads, chartered by the laws of this State, with railroads which form continuous lines within or without the State. 1 G. & H., chaps. 135, 136, 137, the Indiana consolidation law.

" 2d. It may well be that there is no express law to regulate railroad leases. The legislature has not, it is believed, made any express statutory enactment showing how, or under what conditions, and with what solemnities, a lease of a railroad might be made and should be executed. But it is submitted that no public policy is infringed by a lease that is not equally and much more directly involved in consolidation. Indeed, consolidation is nothing more or less than a perpetual lease. Every objection to a lease for ninety-nine years may be urged with tenfold force against the policy of consolidation. A lease for any specific number of years is, in effect, but a modified or base form of consolidation.

" 3d. In the same line of argument, it is believed there is no legislation directly or impliedly prohibitory of railroad leases. Until very lately the policy of the State has been to foster railroads. Even still the legislative policy is to extend the railroad system, whatever change hostile to railroad management may, in some localities, have come over the public mind. The point of the argument, and all that is intended here is, that there is nothing in the statute book prohibitory, either directly or impliedly, of railroad leases.

" 4th. Repeated legislative acts recognize existing railroad leases as valid and the lessees rightfully in possession. This mode of recognition will appear more fully in the statutes hereafter cited.

" 5th. Besides these repeated recognitions through a series of years, the State has never, it is believed, called in question the validity of railroad leases, though it is well known that for the last twenty years these railroad leases have been annually and rapidly increased. We are unable to find any case where

the Attorney General has interposed any inquiry to ascertain by what authority these railroad leases were made.

" 6th. Not only has the State not prohibited railroad leases, or exercised her right to inquire by what authority they were made, but, on the contrary, she has recognized them in the practical affairs and administration of the government. She has taken pains to define the rights and duties of railroad lessees in numerous instances. She has faithfully remembered railroad lessees in the parental levy and collection of taxes, and in many other ways which will claim the attention of the court hereafter.

" The statutes of Indiana as to railroad leases : In 1 G. & H. 527, sec. 3, it is enacted, that ' any railroad company heretofore organized, or which may hereafter be organized under the general or special laws of this State, and which may have constructed, or commenced the construction of their road so as to meet and connect with any other railroad in an adjoining state at the boundary line of this State, shall have the power to make such contracts and agreements with any such road constructed in an adjoining state, for the transportation of freight and passengers, and for the use of its said road, as to the board of directors may seem proper.'

" What does the ' use of its said road ' mean but a lease ? And if this confers the power to lease, as it clearly does, who shall dictate the details ? Who shall settle the length of the term and other minutiæ of the lease ? Only the parties themselves, and not the courts.

" The seventh section, 3 Ind. Stat. 399, treating of the sale of railroads, reads thus :

" ' Sec. 7. Any railroad company incorporated under the provisions of this act, shall have the power and authority to acquire, by purchase or contract, the road, road bed, real and personal property, rights and franchises of any other railroad corporation or corporations which may cross or intersect the line of such railroad company, or any part of the same,' etc., ' and may also purchase or contract for the use and enjoyment, in whole or in part, of any railroad or railroads lying within

adjoining states, may assume such of the debts and liabilities of such corporations as may be deemed proper; and upon purchasing any such railroad or railroads, all the real and personal property of such corporations, so purchased, and also the rights, powers and franchises of the same, shall become vested in the railroad company so purchasing the same, together with,' etc.

" Chapter 265, 3 Ind. Stat. 401, extends the privilege of the foregoing act of March 3d, 1865, to all railroads.

" The word ' lessees ' is repeatedly used by the legislature in various relations, but always in terms of recognition. Thus, in section 6, 3 Ind. Stat. 408, it is used in this wise, viz.: ' and in case of sale or assignment, the purchaser, assignees, or lessees thereof, shall,' etc.

"Another and more direct recognition of leases, lessees, etc., of railroads is the eighth section of the acts of the Special Session of 1865, p. 121 (3 Ind. Stat. 420). Among the subjects of taxation, the State kindly remembers railroads thus, viz.:

" ' In case any railroad or any part thereof shall have been, or shall hereafter be leased, conveyed or mortgaged to any other railroad company, and shall be in the possession of such other company, under such lease, conveyance or mortgage, the road, or part thereof, so leased, conveyed or mortgaged, shall, during the continuance of such possession, be assessed, for taxation, as the property of the company having such possession, in the same manner as if it were a part of the road of such lessee, grantee or mortgagee, under its own charter; and such lessee, grantee or mortgagee shall, during the continuance of such possession, have all the rights and be subject to all the duties and liabilities,' etc.

" 4. Nor is the sanction of the Supreme Court wanting to strengthen the defendants' view of the question. Without spending time to collate the numerous cases more or less in point, we select two.

"One of these is the case of *The Pittsburgh, etc., R. W. Co.* v. *Kain*, 35 Ind. 291. Suit for killing cattle by the C., C. & I. C. R. W. Co., with an allegation that, since the killing, said C.,

C. & I. C. Co. consolidated with the defendant, and was now known and managed by the Pittsburgh, Cincinnati & St. Louis Railway Co.

"On the trial, it was shown that the defendant (appellant in this court) was the lessee of the road, franchises, etc., of the C., C. & I. C. Co. It further appeared that the horse was killed before the making of the lease, while the road was operated by the lessor.

" Here the point in question is the distinction between a lease and a consolidation. It is well settled that the consolidated road is liable for the debts of its constituent parts. *The B. & S. R. R. Co.* v. *Musselman,* 2 Grant Pa. 348. But the evidence of a lease does not support the allegation that the two roads were consolidated. The court held that, on general principles, the defendant, by taking a lease, did not become liable for the torts of the lessor, committed prior to the date of the lease. ' Nor do we think the statute (3 Ind. Stat. 413) fixes on the lessee any liability for animals killed before the lease was executed.' 35 Ind. 292.

" So, in *Huey* v. *The Indianapolis, etc., R. R. Co.,* 45 Ind. 320, the same statute (3 Ind. Stat. 413) is again construed by the Supreme Court. It was there held, that the statute makes the company owning the railroad jointly and severally liable with the lessees, assignees, receivers, and other persons running or controlling any railroad, for stock killed, etc.

" The court say: ' There have been many decisions as to the liability of companies, where the roads were run and operated by lessees, assignees, and receivers,' etc. *Stewart* v. *English,* 6 Ind. 176.

" The case of *Bissell* v. *The Michigan Southern, etc., R. R. Co., supra,* is a full and exhaustive discussion of railway trusts, trustees, and beneficiaries, and what is meant by the phrase *ultra vires. McCluer* v. *The Manchester, etc., R. R. Co.,* 13 Gray, 124 ; *Langley* v. *The Boston, etc., Railroad,* 10 Gray, 103 ; *Life and Fire Ins. Co.* v. *Mechanic Fire Ins. Co.,* 7 Wend. 31 ; *Allegheny City* v. *McClurkan,* 14 Penn. St. 81 ; *Bargate* v. *Shortridge,* 5 H. L. Cas. 297 ; *Railroad Company* v.

The Board, etc., Tippecanoe Co. *et al. v.* The Lafayette, etc., R. R. Co. *et al.*

*Howard,* 7 Wal. 413 ; *Zabriskie* v. *The C., C. & C. R. R. Co.,* 23 Howard, 381 ; *Randall* v. *Van Vechten,* 19 Johns. 60 ; 1 Parsons Con. 139 ; 1 Redfield Am. R. W. Cas. 562, 573–4 ; *Neustadt* v. *The Ill. C. R. R. Co.,* 31 Ill. 484 ; *The Ill. C. R. R. Co.* v. *McLean Co.,* 17 Ill. 291 ; *Rice* v. *The Rock Island, etc., R. R. Co.,* 21 Ill. 93 ; *Palmer* v. *Forbes,* 23 Ill. 301 ; *Bruffett* v. *The Great Western R. R. Co.,* 25 Ill. 353 ; *The Racine, etc., R. R. Co.* v. *Farmers' Loan & Trust Co.,* 49 Ill. 331 ; *The O. & M. R. R. Co.* v. *Wheeler,* 1 Black, 286 ; *Pearce* v. *Atwood,* 13 Mass. 342 ; *Allison* v. *Hubbell,* 17 Ind. 559 ; *Harding* v. *The Third Pres. Church,* 20 Ind. 72 ; *Ex Parte Clifford,* 29 Ind. 106 ; *Wall* v. *The State,* 23 Ind. 150 ; *Webb* v. *Rice,* 6 Hill, 221 ; *Hitt* v. *Ormsbee,* 14 Ill. 235 ; *McQuilkin* v. *Doe,* 8 Blackf. 581 ; *Fort* v. *Burch,* 6 Barb. 74 ; Story Con. 383 ; *The Board, etc.,* v. *Cutler,* 6 Ind. 354 ; *The State* v. *Buckley,* 2 Blackf. 249 ; *Smithson* v. *Dillon,* 16 Ind. 169 ; *The Mayor, etc.,* v. *Colgate,* 2 Kernan, 146 ; *The Sun Mut. Ins. Co.* v. *The Mayor, etc.,* 8 N. Y. 253 ; *The People* v. *Hills,* 35 N. Y. 452 ; *The People* v. *O'Brien,* 38 N. Y. 195 ; Dwarris Stat. 102–107 ; *Smead* v. *The Indianapolis, etc., R. W. Co.,* 11 Ind. 104 ; *E. & H. R. R. Co.* v. *Hunt,* 20 Ind. 457 ; *The President, etc.,* v. *Jackson,* 7 Blackf. 36 ; *Burkham* v. *Beaver,* 17 Ind. 367 ; *The Indianapolis, etc., R. R. Co.* v. *Solomon,* 23 Ind. 534 ; *The Pittsburgh, etc., R. W. Co.* v. *Kain,* 35 Ind. 291 ; *The Indianapolis, etc., R. R. Co.* v. *Warner,* 35 Ind. 516 ; *Smith* v. *Sheeley,* 12 Wal. 358 ; *Myers* v. *Croft,* 13 Wal. 295 ; *Laud* v. *Hoffman,* 12 Am. L. R. N. S. 143 ; *Hayward* v. *Davidson,* 41 Ind. 212 ; *White* v. *Howard,* 38 Conn. 342 ; *Eastern Counties R. W. Co.* v. *Hawkes,* 35 Eng. L. & Eq. 32 ; *Bank, etc.,* v. *Edgerton,* 30 Vt. 190 ; *Eldridge* v. *Smith,* 34 Vt. 484 ; *Miller* v. *R. & W. R. R. Co.,* 36 Vt. 490 ; *Parish* v. *Wheeler,* 22 N. Y. 494 ; *Township of Pine Grove* v. *Talcott,* 19 Wal. 666 ; *Steam Nav. Co.* v. *Weed,* 17 Barb. 378 ; *The O. & M. R. R. Co.* v. *The I. & C. R. R. Co.,* 5 Am. Law Reg. N. S. 733 ; *Richardson* v. *Bates,* 8 Ohio St. 257."

It is due to the counsel on both sides to say that they have supported their propositions with marked industry and ability.

A corporation is a creature of law. It has no powers except those expressly granted or necessarily implied; and none can be implied except such as are necessary to the exercise and enjoyment of those expressly granted. Powers which are not thus granted or implied are denied. The creature cannot exceed the law of its creation, and is amenable to its creator. *The Brooklyn Gravel Road Co.* v. *Slaughter*, 33 Ind. 185; *Hayward* v. *Davidson*, 41 Ind. 212; *The Shelbyville, etc., Turnpike Co.* v. *Barnes*, 42 Ind. 498; *Bank of Augusta* v. *Earle*, 13 Peters, 519; *The East Anglian R. W. Co.* v. *The Eastern Counties R. W. Co.*, 11 C. B. 775; *Madison, etc., Plank Road Co.* v. *The Watertown, etc., Plank Road Co.*, 7 Wis. 59; *Perrine* v. *The Chesapeake, etc., Canal Co.*, 9 How. 172; *Pearce* v. *The Madison, etc., R. R. Co.*, 21 How. 441.

Although a corporation is merely a mental entity, it is a being which can assert its rights, and may be subjected to its duties. Being incorporeal, it can act only by agents. The directors of a corporation are the agents of the corporators and the trustees of the stockholders in the business of the corporation, and may not exceed their agency or violate their trust. The corporation, its directors, and stockholders are, within themselves, different parties, and may sue and be sued *inter se* on case made, as well as sue or be sued by third parties. 1 Redf. Railw. 226, 594; *The Bedford R. R. Co.* v. *Bowser*, 48 Pa. St. 29; *European, etc., R. W. Co.* v. *Poor*, 59 Me. 277; *The Great Luxembourg R. W. Co.* v. *Magnay*, 25 Beav. 586; *Bagshaw* v. *The Eastern Union R. W. Co.*, 2 Macn. & G. 389; *Beman* v. *Rufford*, 1 Sim. N. S. 550; 1 Redf. Railw. 151, 152; 2 Redf. Railw. 365, 366; *Scott* v. *Depeyster*, 1 Edw. Ch. 513; Bouv. Law Dict.

A railroad company is a *quasi* public corporation. It depends on the public for its support, and the public depends upon it for its accommodations. Powers are granted to it which are denied to individuals or partnerships or other corporations, as those for producing, manufacturing, commercial, or monetary purposes. It has privileges which are denied to other common carriers, such as lines of ships, steamboats,

or stage-coaches, or other means of the carrying trade. It exercises the right of eminent domain, which is an attribute of sovereignty. The power of taxation, as in the case before us, is often invoked in its aid. It is therefore bound by reciprocal obligations to the state, and owes reciprocal duties to the public. It must not make contracts beyond its chartered powers, or perform acts injurious to the public, or pursue a course in contravention of public policy. It is created, sustained, and protected by the law, and wields powers with which private enterprise cannot compete ; it must therefore obey the law, keep within its powers, and pursue, in its general course, the end and design of its creation.

Differing thus in many respects from other corporations, railroad companies and railroad law are comparatively new in jurisprudence. The rapid progress of the world and the great improvements of the age are continually bringing about new relations of persons and property, which require new adjustments of the law to advance enterprise and secure rights. But there are well-settled principles governing the course of the common law and the interpretation of statutes, which, if we do not mistake them, will not mislead us.

The instrument under consideration is called in the pleadings and argument an indenture, contract, agreement, lease ; but the words in which it is expressed, under proper interpretation, must determine its true character, without reference to its name. It is a transfer by a railroad corporation of Indiana of the entire property in the western division of its road, running from Lafayette westward to the state line, with delivery of possession, to a railroad corporation of Illinois, for a period of time practically without end. The agreement contemplates a sale of the road transferred, by consent of the stockholders, upon certain contingencies, to pay its bonds ; but in the event such sale is not made, other means are to be provided for the bonds, and semi-annual payments made for the use of the road. It is thus in the power of the parties to make the contract practically a sale, differing from a sale and delivery in nothing except that the consideration for the trans-

fer is paid semi-annually instead of in a sum total.    The true character of the instrument, therefore, if the parties choose so to treat it, is that of a sale; and it seems to us a perversion of the meaning of words, and an evasion of law, to give it any other interpretation.

To maintain the contract before us, it must have been made by authority of law.

The boards of directors, or agents of the corporations which are parties to it, must have had power to make it.

It must have been made within the power of the trust confided to them by the stockholders.

It must not be in contravention of public policy.

But it is urged by the appellees that there is authority of law for making the contract in question, if not in express terms, yet by fair interpretation, whether it be called a lease or a sale; and they cite the act of February 23d, 1853 (1 G. & H. 526).    That act is "to authorize railroad companies to consolidate their stock with the stock of railroad companies in this or in an adjoining state, and to connect their roads with the roads of said companies," etc.    The title nowhere mentions a lease or a sale.    Indeed, the words "to connect their roads with the roads of said companies" would seem to exclude such a conclusion. To connect one road with another does not fairly mean to lease it or sell it to another.    Much less can it mean to authorize the corporation to sever the trunk of its road, transfer the western division, for an unlimited time, to the corporation of another state, and subordinate its eastern division to the western, and to a foreign corporation.    The third section of the act is most strongly relied upon.    It enacts that a railroad company "shall have the power to make such contracts and agreements with any such road constructed in an adjoining state, for the transportation of freight and passengers, or for the use of its said road, as to the board of directors may seem proper."    Even if this section could be held to authorize the transfer of the use of one road to another, the words cannot fairly mean the transfer of one division of a road to the injury of another division of the same road, thus

putting the two divisions in direct antagonism, both in their interests and connection. Although the words, " as to such board of directors may seem proper," express a general power, they must be construed in reference to the subject-matter to which they are applied, and limited within the powers of the corporation and the rights of the stockholders.

The act of March 3d, 1865 (3 Ind. Stat. 395), the seventh section of which is so forcibly urged upon us, and the act of December 20th, 1865 (3 Ind. Stat. 401), have reference only to judicial sales. Indeed, it is expressly provided in the seventh section above cited, " that the provisions of this act shall not be so construed as to authorize any railroad company organizing under the same to consolidate with or acquire by contract or purchase, the road, road bed, real and personal property, rights and franchises of any railroad, already built, equipped and operated within the State of Indiana, and which may cross or intersect the line of the road of any company organized under this act," etc.

The appellees also cite us to the various acts recognizing leases, lessors, and lessees of railroads, making lessees or persons and companies in the possession and use of a railroad liable to pay its taxes, and liable, as well as the lessors, for killing stock during such possession and use, and to the numerous decisions of this court made upon such acts; but we cannot perceive how a power, or a right, can be derived from a statute which simply creates a liability, or from a line of decisions of this court which simply enforces an obligation. Under these acts and within these decisions, we are not aware that the question of making leases or sales by railroad companies was ever raised.

The appellees endeavor to draw support from the fact that no information has been moved, in the name of the State, to reach the conduct of the corporations, their directors, and officers, in the transaction complained of. An information might inquire into the authority of the parties for doing the act, as between the State and the corporations, but it could not afford an adequate private remedy for the stockholders in the case as

sought in the original complaint, nor for the complaining corporation, as prayed for in the cross complaint. And, admitting that an information would successfully lie, it does not deny the parties the right of seeking their private remedy, if the case warrants the proceeding. Indeed, whenever an information will lie to question the contract as being *ultra vires* the corporation, the private remedy will lie against the contract as being void.

It is also claimed by the appellees, that if the contract was originally *ultra vires* the corporation, the parties complaining of it have acquiesced in its terms such a length of time, received benefits under it, and confirmed it by so many acts, that they are now estopped from questioning its validity. A contract *ultra vires* the charter is void, and cannot be made valid by any subsequent act of the corporation, because there is no residuary power to confirm it. What they could not make, they cannot confirm. A void act can never become valid, merely because it remains unquestioned.

2. A board of directors represent the general power of a railroad company, subject to the restrictions in the charter and the by-laws of the corporation. Within their general agency their acts will bind the company. They have no power to manage the property or franchises of the road for their own benefit. They may not divert the business of the road, or impair its ability to carry out its duties to the stockholders. Their power, as between themselves and the company, is conferred by the corporators, and must not be exceeded. They cannot subject the capital of the company to risks, or incur liabilities beyond their agency. They cannot sever the road and favor one portion of it to the injury of another, or serve the interest of a part of the stockholders to the injury of other stockholders. They are the agents of the corporation, and are limited in their powers. They cannot change the *termini* of the road, or its general course and direction, but must in all things subserve the original purpose, design, and end of the organization.

3. A board of directors of a railroad company stands as a

trustee of the stockholders, in the general business and for the property of the road, and may not violate their trust. It can make no considerable change in the road, as severing its trunk, changing its *termini*, leasing or selling a portion of its track, without their consent. As between the corporation and the stockholders, the latter are not bound by the act of the board of directors outside of the ordinary business and general purpose of the road. The corporation may become bound by the act of its board of directors, when the stockholders, as between themselves and the corporation, would not be bound by the same act, unless acquiesced in ; but if the act is *ultra vires* the corporation, it is void, and no one is bound.

4. A railroad company can make no contract in contravention of public policy. The Lafayette, Muncie, and Bloomington Railroad Company contemplated a continuous line of road from Muncie, Indiana, to Bloomington, Illinois. The Toledo, Wabash, and Western Railway Company is a continuous line of road from Toledo, Ohio, to Quincy, Illinois. The two lines intersect and cross each other at Lafayette, Indiana. By the contract and assignment in question, the trunk of the former road is cut at Lafayette, and the eastern division, from that point to Muncie, subordinated to the western division, from the same point to Bloomington, Illinois. By this means, the western division is diverted into the Toledo, Wabash, and Western Railway Company, at Lafayette, and thus forms a continuous line of road from Bloomington, Illinois, to Toledo, Ohio, instead of a continuous line from Bloomington, Illinois, to Muncie, Indiana, as contemplated by the original organization ; and the eastern division is left merely a local road between Lafayette and Muncie, without a western connection, and wholly destroyed as a competing line with the Toledo, Wabash, and Western Railway Company ; and the aid obtained by taxation, and the stock subscribed along the eastern division of the road, are perverted from their original purpose, and subordinated to the western division, subjected to the interests of a portion of the stockholders, and turned

against public policy along the eastern ·division of the road. A single term of this arrangement runs ninety-nine years, with the power of renewal. As corporations never necessarily die, unless their dissolution is effected by the State, the term becomes practically perpetual. The contract carries within itself the power of perpetuity.

We are of opinion that the contract under adjudication was made without authority of law.

That the board of directors and agents of the corporation had no power to make it.

That it is in violation of the rights of the stockholders, and in contravention of public policy.

The following authorities may be consulted in support of these propositions: 1 Redfield Railways, 226, 594, 616, 641, 644, 650; *Boston, etc., R. R. Cor. v. Salem, etc., R. R. Co.*, 2 Gray, 1; *Black v. The Delaware, etc., Canal Co.*, 7 C. E. Green, 130; *Bissell v. The Michigan, etc., R. R. Co.*, 22 N. Y. 258; *Fall River Iron Works Co. v. Old Colony, etc., R. R. Co.*, 5 Allen, 221; *The Great Luxembourg R. W. Co. v. Magnay*, 25 Beavan, 586; *Beman v. Rufford*, 1 Sim. N. s. 550; *Bagshaw v. The Eastern Union R. W. Co.*, 2 Macn. & G. 389; *Bank of Middlebury v. Edgerton*, 30 Vt. 182; *Marsh v. Fulton County*, 10 Wal. 676; *Colman v. Eastern Counties R. W. Co.*, 10 Beav. 1; *T'p of Pine Grove v. Talcott*, 19 Wal. 666; *The East Anglian R. W. Co. v. Eastern Counties R. W. Co.*, 11 C. B. 775; *Richardson v. Sibley*, 11 Allen 65; *Eidman v. Bowman*, 58 Ill. 444; *Stewart's Appeal*, 56 Penn. St. 413; *Madison, etc., Plank Road Co. v. The Watertown, etc., Plank Road Co.*, 7 Wis. 59; *Eldridge v. Smith*, 34 Vt. 484; *Perrine v. The Chesapeake, etc., Co.*, 9 How. 172; *Pearce v. The Madison, etc., R. R. Co.*, 21 How. 441; *Bedford R. R. Co. v. Bowser*, 48 Penn. St. 29; *European, etc., R. W. Co. v. Poor*, 59 Me. 277; *Wright v. Bundy*, 11 Ind. 398; *The Eaton and Hamilton R. R. Co. v. Hunt*, 20 Ind. 457; *The Board of Comm'rs, etc., v. Reynolds*, 44 Ind. 509; *Sparrow v. The Evansville, etc., R. R. Co.*, 7 Ind. 369; *Fisher v. The Evansville, etc., R. R. Co.*, 7 Ind. 407; *Booe v. The Junction R. R. Co.*, 10 Ind. 93; *McCray v. The Junction R. R. Co.*, 9

Ind. 358 ; *The Shelbyville, etc., Turnpike Co.* v. *Barnes,* 42 Ind. 498.

We do not decide that railroad companies cannot become lessors or lessees of other railroad companies, or make other contracts with other railroad companies, for the purpose of running their lines in conjunction, facilitating commerce, travel, and transportation, or for any of the legitimate purposes for which railroad companies are organized. There is much in the legislation of the State favoring this view, and many decisions of this court sustaining the advancing enterprise of the country, but all such contracts must come within the powers of the corporation, must not exceed the powers of the agency that makes them, must not violate the rights of stockholders or contravene public policy.

We do not examine the points raised on motions to strike out certain parts of the complaint ; upon the view we have taken of the case, they have become immaterial.

It remains for us to consider the sufficiency of the special answer to the original complaint. The substance of the answer is, that the stockholders cannot sue as individuals, because the corporation in which they hold stock can afford them the proper remedy, or at least, they cannot sue till the directors refuse to give them redress, nor until demand is first made ; that their board of directors, at the time the answer was filed, was in accord with the stockholders, and seeking the same relief, and therefore the corporation was the proper party to bring and maintain the suit. We are of opinion that this is not a good answer. While it is true, as a general rule, that suit will not lie against an agent or trustee by the principal or *cestui que trust,* until after demand and refusal, yet, where it is known that the party either cannot or will not comply with the demand if made, the other party is excused from making the demand. *Wüstach* v. *Hawkins,* 14 Ind. 541 ; *Law* v. *Henry,* 39 Ind. 414. The law does not require a useless act to be done. It is apparent that the board of directors has not been, at any time since the making of the contract and assignment complained of, in a condition to grant to the stockholders the

relief they ask for in the original complaint, without the consent of the board of directors of the Lafayette, Bloomington, and Mississippi Railroad Company, and the board of directors of the Toledo, Wabash, and Western Railway Company. As no relation of agency, trust, or confidence existed between the appellees in the original complaint and the two companies named last, and as no relief could have been obtained without their consent, a demand on the board of directors of the Lafayette, Muncie, and Bloomington Railroad Company would have been useless, and therefore unnecessary. Nor does the averment in the special answer, that the railroad company, in which the appellants in the original complaint are stockholders, has filed its cross complaint, in which it seeks the same relief, preclude the stockholders from pursuing their private remedy. There may be many reasons why the stockholders of the corporation are entitled to relief, which the corporation itself could not take advantage of. They may indeed have their remedy even against the corporation of which they are members, if the facts warrant relief.

The judgment is reversed; the cause remanded, with instructions to overrule the demurrer to the cross complaint, and sustain the demurrer to the special answer to the original complaint, and for further proceedings according to this opinion.

ON PETITION FOR A REHEARING.

BIDDLE, J.—It is urged upon us that we did not decide the point of practice made by the appellees in their original brief, relative to the cross complaint. They insist, as the code does not prescribe the form of a cross complaint, and continues in force the laws and usages of this State in relation to pleading and practice in civil actions not inconsistent therewith, and in aid thereof, and to supply any omitted case, that the cross complaint should state the original complaint and the proceedings had thereon, and the rights of the parties which are necessary to be made the subject of cross litigation, or the grounds on which it resists the claims set up in the original com-

plaint, according to the old chancery practice. Such a practice once prevailed in England, when a cross bill was filed in the court of chancery to an original bill pending in the court of exchequer, but we are not aware that it was ever the practice in this State, or in America, or even in England, where both the original and cross bills were pending in the same court and in the same suit, as in the case before us. It is true, our code does not prescribe the form of a cross complaint—does not even mention it in terms—yet, when it abolishes the distinction between the forms of actions, prescribes the form of the complaint, and gives the right to bring a cross action on the same terms with the original cross complaint, we do not think it necessary to resort to an old practice, which never did prevail in this State, to ascertain the form of a cross complaint. Besides, the practice is expressly settled in *Ewing* v. *Patterson*, 35 Ind. 326, wherein this court say : " The only real difference between a complaint and a cross complaint is, that the first is filed by the plaintiff and the second by the defendant. Both contain a statement of the facts, and each demands affirmative relief upon the facts stated. In the making up of the issues and the trial of questions of fact, the court is governed by the same principles of law and rules of practice in the one case as in the other."

With the language of the code before us, its spirit pervading our entire judicature, and the well-known fact that the main purpose of it was to relieve the administration of justice from technical embarrassments and useless formalities, as far as practicable, we think this rule eminently proper.

The petitioners also insist most strenuously, that their answer to the original complaint is sufficient to abate that branch of the action, according to the judgment of the court below. Besides what has been said concerning that answer in the opinion already pronounced, let us examine it more closely. In the first place, it is a dilatory plea. All dilatory pleas must be construed strictly. No intendment can be taken in their favor. What is not properly averred within them must be held as against them. This answer sets up the pendency

of the cross complaint in abatement of the original complaint, yet it nowhere avers on what ground the cross complaint rests, or what relief it prays.     True, it says that in the cross complaint " substantially the same relief is prayed that the plaintiffs seek in and by their original complaint." This averment cannot be held good, even though it stated the grounds upon which the relief is sought. It is not well pleaded. If traversed, it would only present the issue whether the relief prayed for in the cross complaint is the same as that prayed for in the original complaint; not whether the grounds and the prayer in the cross complaint are sufficient to authorize the same relief prayed for in the original complaint.

It must be remembered that we cannot look to the cross complaint in aid of the answer to the original complaint. The cross complaint is not, nor is any portion of it, made a part of the answer.     The answer must stand by itself—by the averments on its face which are well pleaded—or it must fall. We adhere firmly to the principle, that when a corporation brings suit on behalf of the company, a stockholder, while such suit is pending, cannot maintain another suit against the same parties, grounded on the same cause of action and seeking the same relief; but the averments in this answer, as they are pleaded, do not bring it within the rule.

Again, the answer is pleaded in abatement of the action, and the judgment of the court below puts an end to the suit, while the answer, if good at all, is good only as a plea in suspension of the action.     "A plea in suspension of the action is one which shows some ground for not proceeding with the suit at the present period, and prays that the pleading may be stayed until that ground be removed." Steph. Pl. 47.

" There are certain legal disabilities, which disqualify the subjects of them to prosecute suits; and which are therefore pleadable ' to their disability ' as plaintiffs.     Some of these entirely defeat the suit; while others only suspend it, *quousque* —until the disability be removed.   *   *   *   If the disability existed, when the cause of action accrued, it has the effect of totally defeating the suit; which, in such a case, was improper

in its commencement. But the disability, when it commences after the accruing of the cause of action, is only a temporary impediment, which does not absolutely destroy the suit; for as the action in this case is rightly commenced, the supervening disability has no other effect, than that of suspending the proceedings in it, until the impediment is removed." Gould Pl. 223, 224.

"There were instances in which the right of action and even the present suit were suspended only, and not destroyed, and when the matter could only be pleaded in abatement, and the plea should conclude *si responderi debet quousque, etc.*, and when the disability is removed the suit will proceed.  *  *  * A plea of this nature was termed, and was for the most purposes a plea in abatement; but in this respect it was dissimilar, that it operated only as a temporary suspension of the present suit, and did not, like the generality of pleas in abatement, allege matter, which, although it gave a better and another action, had the effect of destroying altogether the suit in which it is pleaded." 1 Chitty Pl. 447.

Pleas in suspension of the action seldom occur in practice, and are therefore not readily found in the reported cases, but see *Cremer* v. *Wicket*, 1 Ld. Raymond, 550, and *Faulkland* v. *Stanion*, 12 Mod. 400. It is not in the power of a defendant to abate a suit properly brought against him in the commencement, by afterwards creating a state of facts against the ability of the plaintiff to sue; and there can be no doubt of the right of the plaintiffs in this case to sue at the time they filed their original complaint.

The appellees seem to think that we ought to have decided the general question, whether railroad companies can lease their roads under the laws of this State. It is said that on account of the supposed uncertainty of the decision on this question, business is discouraged, enterprise embarrassed, capital cautious and timid, labor unemployed and restless, and industry generally depressed. When such a question is properly raised before us upon a lease made for the legitimate purposes of commerce and travel, and in accordance with the

proper use of railroads, it will be our duty to decide whether such a lease is authorized and can be upheld by the laws of this State. It must be remembered that courts can decide nothing but what is fairly within the record in each given case. It may be reasonably supposed that all similar cases, falling within the same principle, will be decided in the same way. Farther than this courts cannot go.

But, while it is insisted that we have not decided the general question, it is also stated that we have decided questions not fairly made by the averments in the pleadings. We think differently. The general directions, the crossings, and connections, and the *termini* of the several railroads involved in the case are alleged; the geography of the country through which they pass, and their relations to given points, must be known to us judicially, and the proper application made, without further averments or proof. It does not seem to us that we have decided anything outside of the record, or left undecided any question properly within the record.

But it is earnestly argued that our decision in this case is in conflict with former decisions of this court, especially so with the cases of *Smead* v. *The Indianapolis, Pittsburgh, and Cleveland R. R. Co.*, 11 Ind. 104, and *The State Board of Agriculture* v. *The Citizens Street Railway Co.*, 47 Ind. 407.

The former of these two cases was briefly and simply this: The Indianapolis and Bellefontaine Railroad Company agreed to accept certain bills of exchange to be drawn upon it by the Greenville and Miami Railroad Company, in consideration that the latter road would adopt and maintain the guage of the former road, for the purpose of operating the roads interchangeably and forming a continuous line, the roads having authority to thus unite and form a running connection. The bills were drawn and accepted, and the guage adopted as agreed. On suit brought upon the bills by Smead as the holder, the former pleaded its want of power to make the acceptances, but was held liable.

In the latter of the two cases, the Citizens Street Railway Company made its subscription to the State Board of Agri-

culture, upon the condition that said board would locate and hold the annual state fair on certain grounds north of Indianapolis, for three years. The board having performed its part of the agreement, it was held, that the Street Railway Company was liable on its subscription.

In these cases, the want of power was pleaded in favor of the corporation to defeat the payment of the consideration for benefits which it had received and enjoyed. In this class of cases, the courts will go as far as is consistent with the fixed rules of law to reach the justice, equity, and good conscience of the case.

In the case under consideration, the want of power was pleaded against the corporation to prevent the perpetration of an alleged wrong. In such cases, the courts will hold corporations to the strictest rules of law. There is a wide difference between the two lines of cases. The right, which justice seeks and law endeavors to uphold, lies, in each line, in opposite directions, and must be sought by different ways. In one, the decisions protect right, and in the other they prevent wrong, and thus they are made consistent. In both, they are based on the fundamental principle in jurisprudence, that no one shall take advantage of his own wrong.

Upon full argument, after careful deliberation, and with a due sense of the importance of the decision, we overrule the petition.

WORDEN, J.—I do not concur in the conclusion arrived at by a majority of the court, and think a rehearing should be granted.